**R.J. WOLF, Plaintiff,**

v.

**BANCO NACIONAL DE MEXICO, aka Banamex, Defendant.**

**No. C–82–1328–WWS.**

United States District Court,
N.D. California.

Oct. 26, 1982.

**842**

R.J. Wolf, San Rafael, Cal., in pro. per.

David W. Steuber, Pamela M. Woods, Paul, Hastings, Janofsky & Walker, Los Angeles, Cal., for defendant.

## MEMORANDUM OF OPINION AND ORDER

SCHWARZER, District Judge.

This case of first impression requires the Court to decide whether a time deposit in a foreign bank is a "security" within the meaning of the 1933 Securities Act and the 1934 Securities Exchange Act.

In 1981 plaintiff Wolf deposited $20,000 in each of two ninety-day accounts and in one six-month account with the defendant Banco Nacional de Mexico (Banamex). Plaintiff's dollars were converted at the time of deposit into pesos and could not be withdrawn before the accounts matured. The attraction of the accounts was the high interest they yielded: Banamex made monthly payments to Wolf at net annual interest rates of 31.4%, 32.75% and 33.9%. These impressive yields were more than offset, however, by sizeable losses of principal. Before any of Wolf's accounts had reached maturity, Mexico's central bank, Banco de Mexico (Banxico), abruptly ceased the practice it had followed since 1977 of intervening in the money market in order to maintain a stable rate of exchange between the peso and the dollar. As a result the exchange value of the peso fell immediately and sharply. When Banamex reconverted Wolf's pesos into dollars upon maturity, the $60,000 principal sum had dwindled to roughly $35,500.

Plaintiff alleges that Banamex sold him unregistered securities in violation of § 12(1) of the 1933 Act, 15 U.S.C. § 77*l*(1). He also alleges that a brochure mailed to him by Banamex omitted material information and so misled him in violation of § 17(a) of the 1933 Act, 15 U.S.C. § 77q(a)(2), § 10(b) of the 1934 Act, *id.* § 78j(b), and rule 10b–5, 17 C.F.R. § 240.-10b–5. The brochure, entitled "Mexico's Other Great Climate ... Investment," stated that

The Mexican peso, like the U.S. dollar, is a floating currency which means that the rate of exchange between the peso and the currency you request your interests [sic] and principal to be paid to you in could vary upwards or downwards between the time you purchase your Time Deposit and maturity. However, since 1977 the Banco de Mexico, Mexico's Central Bank, has maintained a stable peso-dollar parity by intervening in the money market.

Plaintiff contends that the brochure should have included the following material facts: that the parity of the peso with the dollar depended upon Banxico's continuing intervention; that Banxico would not necessarily continue to intervene; and that if Banxico ceased to intervene, the decline in the peso's value could not only eliminate net return on time deposits but could also cause the depositor to lose much of his principal.

The Court does not reach these fraud claims. Both parties have moved for summary judgment on the dispositive issue of whether plaintiff's time deposits were securities. If the deposits were securities, then Banamex is strictly liable under the 1933 Act for failing to register them. If the deposits were not securities, then this Court has no jurisdiction over any of plaintiff's claims.

*The Statute*

[1] The 1933 Act provides:

When used in this subchapter, unless the context otherwise requires—

(1) The term "security" means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a "security," or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

15 U.S.C. § 77b(1). Plaintiff asserts that because a certificate of deposit comes within the literal terms of the Act as an "evidence of indebtedness," it is a security. Defendant argues that because the term "evidence of indebtedness" was omitted from the 1934 Act,[1] plaintiff's rule 10b–5 claim must be dismissed. The arid literalism in which both parties engage has been repudiated by the courts, and it is unnecessary to assign the peso accounts to a particular statutory pigeonhole.[2] The Supreme Court has consistently admonished that in determining whether an instrument is a security, "the emphasis should be on economic reality" rather than on the form of the transac-

---

1. Except for that omission, the 1934 Act contains a definition of "security" that is essentially identical to its 1933 counterpart.

When used in this chapter, unless the context otherwise requires—

\* \* \* \* \* \*

(10) The term 'security' means any note, stock, treasury stock, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit, for a security, or in general, any instrument commonly known as a 'security' or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.

15 U.S.C. § 78c(a)(10). The 1933 and 1934 definitions are construed indistinguishably.

*United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 847 n. 12, 95 S.Ct. 2051, 2058 n. 12, 44 L.Ed.2d 621 (1975); *Tcherepnin v. Knight,* 389 U.S. 332, 335–36, 88 S.Ct. 548, 552–53, 19 L.Ed.2d 564 (1967); *Amfac Mortgage Corp. v. Arizona Mall of Tempe, Inc.,* 583 F.2d 426, 431 (9th Cir.1978). This opinion therefore draws on the case law under both Acts, even though the Court does not reach plaintiff's claims under the 1934 Act.

2. Certificates of deposit have been labelled not only "evidences of indebtedness" but also "investment contracts," *see MacKethan v. Peat, Marwick, Mitchell & Co.,* 439 F.Supp. 1090, 1094 (E.D.Va.1977); *Superintendent of Insurance of New York v. Bankers Life & Casualty Co.,* 300 F.Supp. 1083, 1110 (S.D.N.Y.1969), and "notes," *Bankers Life, id.*

Typically, however, the courts simply look to the judicially established criteria of a "security" without attempting to fit the instrument or transaction into one of the statutes' terms. *See, e.g., Hamblett v. Bd. of Savings & Loan Ass'ns, Inc.,* 472 F.Supp. 158, 165 (N.D.Miss. 1979); *Hendrickson v. Buchbinder,* 465 F.Supp. 1250, 1252 (S.D.Fla.1979).

tion and the letter of the statute. *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 848, 95 S.Ct. 2051, 2058, 44 L.Ed.2d 621 (1974) (quoting *Tcherepnin v. Knight,* 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967)); *see American Fletcher Mortgage Co. v. United States Steel Credit Corp.,* 635 F.2d 1247, 1253 (7th Cir.1980) ("literal inclusion in the statutory list of potential securities is not the test"), *cert. denied,* 451 U.S. 911, 101 S.Ct. 1982, 68 L.Ed.2d 300 (1981). In *SEC v. C.M. Joiner Leasing Corp.,* 320 U.S. 344, 350–51, 64 S.Ct. 120, 123–24, 88 L.Ed. 88 (1943), the Court articulated the guiding principle that courts "will construe the details of an act in conformity with its dominating general purpose, will read text in light of context and will interpret the text so far as the meaning of the words fairly permits so as to carry out in particular cases the generally expressed legislative policy." The statutes expressly invite this inquiry into "context," and the inquiry has largely superseded the language of the Acts; indeed, in some cases it has yielded results that squarely conflict with that language.

An example is the exemption from the 1933 Act—paralleled by a definitional exclusion from the 1934 Act—of "[a]ny note, draft, bill of exchange, or banker's acceptance which arises out of a current transaction or the proceeds of which have been or are to be used for current transactions, and which has a maturity at the time of issuance of not exceeding nine months . . . ." 15 U.S.C. § 77c(a)(3); *see also id.* § 78c(a)(10). This provision originated in a letter to Congress from the Secretary of the Federal Reserve Board. The Secretary described the proposed Securities Act as "intended to apply only to . . . investment securities," and suggested an amendment to exclude "short-time paper issued for the purpose of obtaining funds for current transactions in commerce, industry, or agriculture and purchased by banks and corpo-

rations as a means of employing temporarily idle funds." Hearings on H.R. 4314, 73rd Cong., 2d Sess. 180 (1933).[3] The amendment, in other words, was designed to exempt commercial paper as distinct from investment securities. Judicial interpretations of the exemption have focused on the "commercial" or "investment" nature of a purported security, ignoring altogether the instrument's period of maturity. Notes with a maturity of more than nine months have been excluded from the coverage of the Acts because of their "commercial" character, *see McClure v. First National Bank,* 497 F.2d 490 (5th Cir.1974), *cert. denied,* 420 U.S. 930, 95 S.Ct. 1132, 43 L.Ed.2d 402 (1975), and notes with a maturity of less than nine months have been included because they represented "investments." *See Zabriskie v. Lewis,* 507 F.2d 546 (10th Cir. 1974); *Bellah v. First National Bank,* 495 F.2d 1109 (7th Cir.1972). The nine-month exemption has thus in effect been deleted from the statute by judicial interpretation.

Similarly, although "stock" is of course included in the statutory list of securities, some "stock" purchases have been excluded from the coverage of the securities laws because they lacked customary attributes of a security. *United Housing Foundation, Inc. v. Forman, supra.* Loan commitments, on the other hand, may be securities although the Acts make no mention of them. *See McGovern Plaza Joint Venture v. First of Denver Mortgage Investors,* 562 F.2d 645, 646 (10th Cir.1977). In short, the language of the Acts is neither talismanic, as the plaintiff would have it, nor exhaustive, as the defendant urges. The Supreme Court's analysis in the recent decision of *Marine Bank v. Weaver,* —— U.S. ——, 102 S.Ct. 1220, 71 L.Ed.2d 409 (1982), confirms that the determination whether an instrument is a security does not turn on whether it answers to the particular terms of the statute.

---

**3.** The SEC interpreted the exemption as applicable to "prime quality negotiable commercial paper of a type not ordinarily purchased by the general public, that is, paper issued to facilitate well-recognized types of current operational

business requirements, and of a type eligible for discounting by Federal Reserve banks." Release No. 33–4412, 17 C.F.R. § 231.4412 (1961).

## The Weaver Case

The Court rejects at the outset defendant's contention that *Weaver* controls this case. In *Weaver* the Third Circuit had reversed a summary judgment[4] in favor of defendant Marine Bank on the ground that a *domestic* certificate of deposit is "in form and in fact a long-term debt obligation," 637 F.2d 157, 164 (3d Cir.1981), and hence a security. The Supreme Court reversed the Third Circuit because it saw

> important differences between a certificate of deposit purchased from a federally regulated bank and other long-term debt obligations. The Court of Appeals failed to give appropriate weight to the important fact that the purchaser of a certificate of deposit is virtually guaranteed payment in full, whereas the holder of an ordinary long-term debt obligation assumes the risk of the borrower's insolvency. The definition of security in the 1934 Act provides that an instrument which seems to fall within the broad sweep of the Act is not to be considered a security if the context otherwise requires. It is unnecessary to subject issuers of bank certificates of deposit to liability under the antifraud provisions of the federal securities laws since the holders of bank certificates of deposit are abundantly protected under the federal banking laws. We therefore hold that the certificate of deposit purchased by the Weavers is not a security.

102 S.Ct. at 1224–25. The Court held that the combination of reserve, reporting and inspection requirements imposed by federal banking law and the insurance of deposits by the Federal Deposit Insurance Corporation (FDIC) obviated the need to protect the purchaser of a domestic certificate of deposit under the securities laws. The purchaser assumes no risk and therefore needs no protection.

Mexican bank deposits are not insured. Banamex urges that Mexican reserve, reporting and inspection requirements are as thorough as their American counterparts. Even if this is so, *Weaver* does not rest on the independent effect of such requirements on a depositor's risk; and to the extent *Weaver* invokes those requirements, it appears to emphasize their federal character, referring to "deposits in *federally* regulated banks ... protected by the ... requirements of the *federal* banking laws." *Id.* at 1225 (emphasis added). In this connection it is significant that although Congress exempted bank securities from the registration provisions of the 1933 Act, it did not extend that exemption to foreign banks.[5] *Weaver* thus does not compel the conclusion that Mexican banking laws obviate the application of the securities acts in this case.

Furthermore, plaintiff assumed not only the risk of Banamex's insolvency but also the much more substantial risk of a currency devaluation. Neither of these risks was present in *Weaver.* The question is then whether a certificate of deposit whose purchaser is not completely insulated from risk

---

**4.** The impropriety of summary judgment on the question whether plaintiff had purchased a security was the principal basis of the Third Circuit's opinion. The Supreme Court ignored that issue, implicitly deciding that the status of Weaver's certificate of deposit did not turn on any disputed question of fact.

The existence of a security is a mixed question of law and fact. To the extent that the relevant facts are undisputed, the question is one of law, appropriately resolved by summary judgment. *See United States v. Fishbein,* 446 F.2d 1201, 1207 (9th Cir.1971), *cert. denied,* 404 U.S. 1019, 92 S.Ct. 683, 30 L.Ed.2d 667 (1972); *Chapman v. Rudd Paint & Varnish Co.,* 409 F.2d 635, 639 (9th Cir.1969). If, however, a party identifies disputed facts that are material

to determining whether a security has been purchased, the question becomes one of fact and cannot be resolved summarily. *See Great Western Bank & Trust v. Kotz,* 532 F.2d 1252, 1260 (9th Cir.1976); *Roe v. United States,* 287 F.2d 435, 440 (5th Cir.), *cert. denied,* 368 U.S. 824, 82 S.Ct. 43, 7 L.Ed.2d 29 (1961).

Here the material facts are undisputed. There is accordingly no question that summary judgment is appropriate.

**5.** "For purposes of this paragraph, ... the term 'bank' means any national bank, or any banking institution organized under the laws of any State, territory, or the District of Columbia ...." 15 U.S.C. § 77c(a)(2).

is "within the broad sweep of the Act," as *Weaver* suggests. *Id.*[6]

### What Is A Security?

The test generally cited for determining whether an instrument or transaction is a security was articulated by the Supreme Court in *SEC v. W.J. Howey Co.,* 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). In that case investors purchased plots in an orange grove and leased the land back to the seller under a service contract in which the seller agreed to cultivate and market the crops and to remit the net proceeds to the investor. The Court labelled the arrangement an "investment contract," which it defined as an "investment of money in a common enterprise with profits to come solely from the efforts of others." *Id.* at 301, 66 S.Ct. at 1104. The Court described this as a "flexible" definition designed to "meet the countless and variable schemes devised by those who seek the use of money of others on the promise of profits." *Id.* at 299, 66 S.Ct. at 1103.

Some courts have assumed that the *Howey* test defines not only investment contracts but the entire universe of securities. *See, e.g., United American Bank v. Gunter,* 620 F.2d 1108, 1116–19 (5th Cir.1980); *Goodman v. Epstein,* 582 F.2d 388, 406 (7th Cir.1978), *cert. denied,* 440 U.S. 939, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979); *Trostle v. Nimer,* 510 F.Supp. 568, 572 (S.D. Ohio 1981); *Manchester Bank v. Connecticut Bank & Trust Co.,* 497 F.Supp. 1304, 1311–12 (D.N. H.1980); *Hendrickson v. Buchbinder,* 465 F.Supp. 1250, 1252 (S.D.Fla.1979). The Supreme Court itself encouraged this understanding of *Howey* by stating in *United Housing Foundation, Inc. v. Forman, supra,* that the *Howey* test

> in shorthand form, embodies the essential attributes that run through all of the Court's decisions defining a security. The touchstone is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or

managerial efforts of others. By profits, the Court has meant either capital appreciation resulting from the development of the initial investment, as in *Joiner, supra* (sale of oil leases conditioned on promoters' agreement to drill exploratory well), or a participation in earnings resulting from the use of investors' funds, as in *Tcherepnin v. Knight, supra* (dividends on the investment based on savings and loan association's profits). In such cases the investor is "attracted solely by the prospects of a return" on his investment. 421 U.S. at 852, 95 S.Ct. at 2060. In *Forman,* purchasers of cooperative apartments in a low-cost housing project were required to purchase stock in proportion to the number of rooms acquired. The payment for the stock was treated as a down payment on the apartment. The shares were not transferable to a nontenant, carried no voting rights, and entitled the holder to no financial return. Inasmuch as the shares thus plainly had none of the investment, profit or risk attributes of a security, the quoted statement of the Supreme Court focusing on the requirement of an expectation of profit goes beyond what was necessary for the decision.

That statement raises serious problems when applied to debt as opposed to equity instruments. It must be noted that until *Forman,* the Court had had before it only cases involving purported investment contracts. Not until *Weaver* was the Court confronted with a debt instrument—plainly not an "investment contract"—and it is significant that in deciding that case the Court did not rely on the *Howey* test.

■ Although an investor in debt securities is " 'attracted solely by the prospects of a return' on his investment," that type of investment lacks the "touchstone . . . [of] the presence of an investment in a common venture premised on a reasonable expectation of profits . . . ." *Forman, supra.* The return on debt instruments is fixed and independent of the profits from the enter-

---

**6.** In a footnote, the *Weaver* Court remarked that a certificate of deposit does not "invariably fall[] outside the definition of a security

. . . . Each transaction must be analyzed and evaluated on the basis of . . . the factual setting as a whole." 102 S.Ct. at 1225 n. 11.

prise. Some courts, relying on *Howey*, have thus been led to hold that certain debt instruments are not securities partly because they give rise to no expectation of profit "either over and above or of a different nature than that found in a commercial lending transaction." *United American Bank v. Gunter, supra,* 620 F.2d at 1117; *see National Bank of Commerce v. All American Assurance Co.,* 583 F.2d 1295, 1301 (5th Cir.1978); *Canadian Imperial Bank of Commerce Trust Co. v. Fingland,* 615 F.2d 465, 470 (7th Cir. 1980) (certificates of deposit); *Burres, Cootes & Burres v. MacKethan,* 537 F.2d 1262, 1265 (4th Cir. 1976) (same), *cert. denied,* 434 U.S. 826, 98 S.Ct. 103, 54 L.Ed.2d 85 (1977); *Rispo v. Spring Lake Mews, Inc.,* 485 F.Supp. 462, 466 (E.D.Pa.1980); *Tri-County State Bank v. Hertz,* 418 F.Supp. 332, 343 (M.D.Pa. 1976). But if such an expectation were required of *all* security purchasers, then debt instruments of all kinds would be excluded from the coverage of the securities laws. It is unlikely that either the Congress or the Supreme Court intended that result. The *Howey* test must therefore be considered to be limited to equity instruments. *See Meason v. Bank of Miami,* 652 F.2d 542, 549–50 (5th Cir.1981), *cert. denied,* 455 U.S. 939, 102 S.Ct. 1428, 71 L.Ed.2d 649 (1982); *Exchange National Bank v. Touche Ross & Co.,* 544 F.2d 1126, 1136 (2d Cir.1976) (Friendly, J.) (test is "of dubious value" as applied to debt instruments).

Having reached that conclusion, the Court must determine what test to apply to debt instruments. The Courts of Appeals have struggled with that question in numerous cases involving a wide variety of instruments and transactions. The Third, Fifth, Seventh and Tenth Circuits have developed what is generally referred to as a "commercial-investment" test. Eschewing an analytical formulation, this test involves a case-by-case determination based on comparison of the instrument in question with opposing archetypes: on the one hand, common stock, which is plainly a security; on the other hand, consumer loans and short-term commercial paper, which are just as plainly not. *See, e.g., C.N.S. Enterprises,*

*Inc. v. G. & G. Enterprises, Inc.,* 508 F.2d 1354, 1359 (7th Cir.), *cert. denied,* 423 U.S. 825, 96 S.Ct. 38, 46 L.Ed.2d 40 (1975). This test reflects the premise that the securities laws were intended to protect investors but were not meant to impose burdensome obligations on those engaged in ordinary commercial or consumer transactions. *See generally* S.Rep. No. 47, 73rd Cong., 1st Sess. 1 (1933); Fitzgibbon, "What Is A Security? —A Redefinition Based on Eligibility to Participate in the Financial Markets," 64 Minn.L.Rev. 893, 915–19 (1980). Perhaps the principal merit of the test—its simplicity—is also its demerit: the test provides little or no guidance to transacting parties and lower courts.

The Ninth Circuit, in a series of cases, has transmuted the *Howey* "expectation of profit" test into a "risk capital" test. In *El Khadem v. Equity Securities Corp.,* 494 F.2d 1224 (9th Cir.), *cert. denied,* 419 U.S. 900, 95 S.Ct. 183, 42 L.Ed.2d 146 (1974), the transaction at issue was a plan offered by an investment company under which the plaintiff borrowed money from the company to purchase mutual fund shares which in turn were pledged as collateral for the loan. The plan offered plaintiff the benefit of tax deductions from prepaying the interest on the loan and the leverage of any increase in the market value of the collateral. The court acknowledged that, unlike in *Howey*, plaintiff's financial *gain* would not vary depending on defendant's skill and effort, but it found that the *Howey* test was nonetheless satisfied because under the terms of the transaction plaintiff did face a risk of financial *loss* which depended on the skill with which defendant managed the plan. This variation on *Howey* is of course significant, considering the previously noted limitation of the *Howey* test, in that it can be applied to debt securities. It has not, however, been endorsed by the Supreme Court. In *Forman*, the Court specifically declined to accept the approach of the *El Khadem* court, adding that "[e]ven if we were inclined to adopt such a risk capital approach, we would not apply it in the present case [where] [p]urchasers ... take no significant

risk . . . ." 421 U.S. at 837 n. 24, 95 S.Ct. at 2053 n. 24.

In *Great Western Bank & Trust v. Kotz,* 532 F.2d 1252 (9th Cir.1976), the Ninth Circuit applied the "risk capital" test to a note given by a corporation to a bank in exchange for a ten-month, renewable line of credit. To determine whether the transaction was a security, the court examined "the nature and degree of risk accompanying the transaction for the party providing the funds." 532 F.2d at 1256. Distinguishing between a "risky loan" and "risk capital," it developed a set of six factors to frame the analysis: (1) the length of time during which the funds are at risk; (2) whether the funds are collateralized; (3) whether the obligation was issued to a single party or numerous investors; (4) the relationship of the sum involved to the size of the borrower's business; (5) whether the funds are used as capital or to finance current operations; and (6) the form of the obligation. It then proceeded to apply these factors to the transaction, holding the note not to be a security because, in view of the severe restrictions imposed on the borrower, the risk "created by the lending of money . . . amounted only to that risk normally associated with the lending of money for a period of time" and was not dependent on the borrower's "enterprise efforts." 532 F.2d at 1259–60. Judge Wright concurred, giving as an additional reason that the transaction was a commercial loan.

The same analysis was applied in *United California Bank v. THC Financial Corp.,* 557 F.2d 1351 (9th Cir.1977), in which the court held that an agreement by one corporation to purchase from a bank all of the notes given to the bank by another corporation to evidence a commercial loan in the event the latter corporation defaulted was not a security. After reviewing the evidence in the light of the six factors, the court concluded that this was a commercial lending arrangement between sophisticated parties with equal access to the relevant information.

Finally in *Amfac Mortgage Corp. v. Arizona Mall of Tempe, Inc.,* 583 F.2d 426 (9th Cir.1978), the court applied the "risk capital" test to a note issued to obtain a construction loan, secured by a deed of trust and by various provisions of the building loan agreement. After reviewing the six factors, the court held that "Amfac was making a construction loan to finance a shopping center. A note given to a lender in the course of a commercial financing transaction is not a security." 583 F.2d at 434.

It is clear that the "risk capital" test departs from the essential requirement of *Howey,* as refined in *Forman,* that there be "an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." [7] 421

---

7. In *Forman* the Supreme Court based its decision that shares in a cooperative housing corporation were not securities in part on the absence of any expectation by the shareholders of a "financial" benefit. "[T]here can be no doubt that investors were attracted solely by the prospect of acquiring a place to live, and not by financial returns on their investments." 421 U.S. at 853, 95 S.Ct. at 2061. The Court defined "financial returns" or profits as "capital appreciation resulting from the development of the initial investment . . . or a participation in earnings resulting from the use of investors' funds." *Id.* at 852, 95 S.Ct. at 2060.

Such a test poses obvious difficulties. Almost any investor in real estate, even if it is a personal residence as in *Forman,* is likely to have an eye on prospective "capital appreciation." Moreover, the fact that an investor, rather than looking for capital appreciation or earnings, has settled for a guaranteed fixed return (as in the case of many bonds) does not necessarily make the policies underlying the securities acts inapplicable.

Furthermore, the requirement of a "financial" return is at odds with the risk capital test followed in this Circuit, which focuses retrospectively on what the investor stands to lose rather than prospectively on what he expects to gain. In the original risk capital opinion, for example, the California Supreme Court held that where membership fees were used to develop a country club, the membership interests were securities. Justice Traynor wrote that the object of securities legislation is

to afford those who risk their capital at least a fair chance of realizing their objectives in legitimate ventures, whether they expect a return on their capital in one form or another. Hence the act is as clearly applicable to the sale of promotional memberships as it would be had the purchasers expected their

U.S. at 852, 95 S.Ct. at 2060. It does so because the exigencies of commercial life require a feasible test for the application of the securities acts to debt instruments. A close examination of the decisions in which that test was developed and applied, however, raises serious questions about its analytical viability. Each of the six factors is open-ended, leaving it to the courts to speculate, for example: how short a maturity is too short; what ratio of loan to assets is too high; and where to draw the line between "capital" and funds for current operation (working capital). Even if it were possible to define the individual factors with any precision, the courts are left at large with respect to how much weight to attach under the circumstances of the particular case to the presence—or the absence—of each of the six factors or of other possibly relevant factors not identified in the "risk capital" test.[8] *See Exchange National Bank v. Touche Ross & Co., supra,* 544 F.2d at 1137. It is difficult to see, moreover, how the court distinguishes investment risk from credit risk. *See, e.g., Great Western Bank & Trust v. Kotz, supra,* 532 F.2d at 1259 ("While some 'risk' was created by the lending of money, it amounted only to that risk normally associated with the lending of money for a period of time."). Finally, the court's opinions themselves suggest that, after exhausting the "risk capital" analysis, the court made its decision by applying what amounts to a "commercial-investment" dichotomy. *See, e.g., Amfac Mortgage Corp. v. Arizona Mall of Tempe, Inc., supra,* 583 F.2d at 434 ("Amfac was not making an investment ... [it] was making a construction loan ....").

The problems inherent in the "risk capital" test as a yardstick on which business and courts should be able to rely become obvious when that test is applied to the instant case:

(1) Wolf's money was at risk for only six months or less.

(2) His accounts, although not collateralized, were collectible out of the ample assets of Banamex.

(3) The transaction was not individually negotiated, since Wolf was presumably only one of many persons who make such deposits.

(4) Wolf's account, and presumably the aggregate of such accounts, was minuscule in relation to Banamex's total business and assets.

(5) It is unlikely that funds from such accounts were put to any particular use rather than to augment Banamex's assets generally.

(6) Although the transaction took the form of a bank deposit, such deposits were promoted and widely solicited by Banamex as investments.

Thus, the measures of risk (factors (1), (2) and (4)) argue against finding a security. Yet the indicia of investment (factors (3), (5) and (6)) tend to support such a finding. Nothing in the six-factor analysis, or in the evidence underlying the various factors, helps to determine the weight to be given

return in some such familiar form as dividends. Properly so, for otherwise it could easily be vitiated by inventive substitutes for conventional means of raising risk capital. *Silver Hills Country Club v. Sobieski,* 55 Cal.2d 811, 13 Cal.Rptr. 186, 188–89, 361 P.2d 906, 908–09 (1961).

The absence of an expectation of financial return was not crucial to the Supreme Court's decision in *Forman.* The main point in that case was that the shareholders received something of intrinsic value—a place to live. *Forman* thus comes within paragraph (b) of this Court's definition set forth on page 851, *infra.*

**8.** In *Great Western Bank & Trust v. Kotz, supra,* 532 F.2d at 1257, the court did identify

time as "the most important factor," but it also observed: "We do not hold that application of any single factor ... compels us to affirm the district court. Nor do we intimate that in a different case there would not be other factors to consider." *Id.* at 1258.

As to the weight to be attached to the form or label of the transaction, *compare SEC v. Joiner Leasing Corp.,* 320 U.S. 344, 353, 64 S.Ct. 120, 124, 88 L.Ed. 88 (1943) ("it is not inappropriate that promoters' offerings be judged as being what they were represented to be") *with United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 850, 95 S.Ct. 2051, 2059, 44 L.Ed.2d 621 (1975) ("the name given to an instrument is not dispositive").

to one side of the balance or the other. Here three factors lead to one conclusion while an equal number leads to the opposite conclusion. The risk capital analysis cannot yield a principled decision in this case.

A close reading of the decisions purporting to apply the "risk capital" test or the "commercial-investment" test suggests that the process of decision in those cases rests less on analysis than on synthesis. The courts do not embrace particular reasons for decision with any consistency; they have sought instead to arrive at *results* which would maintain consistency within the growing body of case law under the securities acts. Consistency and harmonization form a thread that runs through the decisions. *See, e.g., Meason v. Bank of Miami, supra,* 652 F.2d at 550; *Amfac Mortgage Corp., supra,* 583 F.2d at 431 & n. 6; *McClure v. First National Bank, supra,* 497 F.2d at 492; *Tri-County State Bank v. Hertz, supra,* 418 F.Supp. at 342 n. 5.

Once one acknowledges the limitations of a multi-factor analytical approach to cases where the factors lack definition and defy weighting,[9] the way out of the confusion thus becomes clear. The large body of authoritative case law can be synthesized into a framework for decision that accommodates the universe of instruments and transactions.

*What Is Not A Security?*

The most direct and reliable approach[10] to deciding cases, such as this one, involving instruments or transactions that unquestionably exhibit the elements most commonly associated with securities is to include them within the meaning of a "security" unless they fall into certain well-defined categories. *Cf. Exchange National Bank v. Touche Ross & Co., supra,* 544 F.2d at 1137.[11] This approach is consonant with the structure of the definitional provisions of the Acts, according to which virtually any transaction in which one person provides funds to another with the expectation of gain is a security *unless* "the context otherwise requires." The Acts leave to the courts and the SEC the task of developing a definition of what is *not* a security, and case law has defined the requirements of context sufficiently to comprehend almost all situations likely to arise.

█ The cases, both in the Ninth Circuit and elsewhere, establish that a transaction

---

9. It goes without saying that in this as in many other areas of the law predictability ranks as high on the scale of institutional values as soundness of result. The instant case presents a good example: institutions such as Banamex ought to be given the means of predicting with reasonable assurance whether a financial program involving large numbers of transactions is subject to the registration and other provisions of the securities acts. Even more important, due process requires that the application of the criminal securities fraud statutes not be left to guesswork and speculation. This problem is suggested by cases such as *United States v. Carman,* 577 F.2d 556, 563–64 (9th Cir.1978) (conviction for securities fraud upheld where defendant had sold packages of notes, given by students for loans, subject to loan service and repurchase provisions; court held that purchaser's "risk of loss is sufficient to bring the transaction within the meaning of a security, even where the anticipated financial gain is fixed").

10. This Court is of course bound by the law of the Ninth Circuit, and this decision is founded on that principle. But the Court views that law, in accordance with the common law tradition, as residing more in the results reached by the cases than in the articulation of particular reasons for those results. See III R. Pound, *Jurisprudence* (1959) 564–66.

11. In *Touche Ross,* Judge Friendly, seeing little prospect for success in "the efforts to provide meaningful criteria for decision under 'the commercial-investment' dichotomy," and "not . . . much force in the . . . 'risk capital' test," adopted a literalist approach, placing on the party asserting that a note otherwise within the literal language of the act is not a security the burden of showing that the "context otherwise requires." That approach, however, fails to impart any certainty or predictability to the application of the "context" exclusion. As the following discussion seeks to show, a considerable degree of predictability can be derived by importing into the literalist approach the substance of the existing decisional law. While doing so will not enable parties or lower courts to predict with certainty the outcome of an appeal, it provides them with helpful guidelines.

in which one person ("the investor") provides funds to another [12] with the expectation of a financial or economic benefit [13] is a security *unless:*

(a) the benefit derives largely from the managerial efforts of the investor; [14] or

(b) the investor receives something of intrinsic value which he intends to use or consume; [15] or

(c) the provider of funds is in the business of lending funds in such transactions; [16] or

**12.** A compulsory, noncontributory pension plan is not a security because the employee provides no funds. *See Int'l Bhd. of Teamsters v. Daniel,* 439 U.S. 551, 99 S.Ct. 790, 58 L.Ed.2d 808 (1979); *Dudo v. Schaffer,* 82 F.R.D. 695 (E.D. Pa.1979).

**13.** *See* note 7 *supra.*

**14.** A franchise is ordinarily not a security because the franchisee's returns are a function of his own efforts. *See Martin v. T.V. Tempo, Inc.,* 628 F.2d 887 (5th Cir.1980); *Bitter v. Hoby's Int'l, Inc.,* 498 F.2d 183 (9th Cir.1974); *Lino v. City Investing Co.,* 487 F.2d 689 (3d Cir.1973); *Mr. Steak, Inc. v. River City Steak, Inc.,* 460 F.2d 666 (10th Cir.1972); *Chapman v. Rudd Paint & Varnish Co.,* 409 F.2d 635 (9th Cir.1969) (distributorship). The unconventional franchise purchased by a participant in a pyramid promotion scheme is a security, however, because the "critical determinant" of the success of the enterprise is the luring effect of meetings run by the franchisor alone. *SEC v. Koscot Interplanetary, Inc.,* 497 F.2d 473, 485 (5th Cir.1974); *see SEC v. Glenn W. Turner Enterprises, Inc.,* 474 F.2d 476 (9th Cir.), *cert. denied,* 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973). In *Turner* the court held that the crucial inquiry is "whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *Id.* at 482. The investor in a pyramid promotion scheme purchases merely a "share in the proceeds of the selling efforts" of the promoter. *Id.*

The same reasoning applies to real estate transactions in which the vendee enters into a management or development contract with the vendor. If the investor retains ultimate control over the land and is to develop it largely through his own efforts, he has not purchased a security. *See Schultz v. Dain Corp.,* 568 F.2d 612 (8th Cir.1978); *Happy Investment Group v. Lakeworld Properties, Inc.,* 396 F.Supp. 175, 180–81 (N.D.Cal.1975). If, however, the "real burden of management and development" is on the vendor, the vendee has purchased a security. *Aldrich v. McCulloch Properties, Inc.,* 627 F.2d 1036, 1040 (10th Cir.1980); *see SEC v. W.J. Howey Co.,* 328 U.S. 293, 300, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244 (1946); *Cameron v. Outdoor Resorts of America,* 608 F.2d 187, 192 (5th Cir.1979); *SEC v. Bailey,* 41 F.Supp. 647 (S.D.Fla.1941); *Lowery v. Ford Hill Investment Co.,* 192 Colo. 125, 556 P.2d 1201 (1976). The SEC has outlined the criteria for determining whether collateral arrangements transform the purchase of real estate into a security transaction. *See* SEC Rel. No. 33–5347, 17 C.F.R. § 231.5347, 38 Fed.Reg. 1735 (1973).

**15.** *See* note 7 *supra; Forman,* 421 U.S. at 852–53, 95 S.Ct. at 2060–61; *Howey,* 328 U.S. at 300, 66 S.Ct. at 1103; *B. Rosenberg & Sons, Inc. v. St. James Sugar Cooperative, Inc.,* 447 F.Supp. 1, 4 (E.D.La.1976) ("When a purchaser is motivated by a desire to use what he has purchased, the securities laws do not apply."), *aff'd,* 565 F.2d 1213 (5th Cir.1977); *Fogel v. Sellamerica, Ltd.,* 445 F.Supp. 1269, 1277–78 (S.D.N.Y.1978) (residential lots); *Joyce v. Ritchie Tower Properties,* 417 F.Supp. 53 (N.D.Ill. 1976) (condominiums); *Contract Buyers League v. F & F Investment,* 300 F.Supp. 210, 224 (N.D.Ill.1969) (used residential property), *aff'd,* 420 F.2d 1191 (7th Cir.), *cert. denied,* 400 U.S. 821, 91 S.Ct. 42, 27 L.Ed.2d 49 (1970); *SEC v. Bailey,* 41 F.Supp. 647, 650 (S.D.Fla. 1941) (investment in tung groves was a security because purchasers bought land not "for its intrinsic value" but "as a source of income").

**16.** This accounts for the result in most cases in which courts have wrestled with some form of the commercial/investment dichotomy. *See, e.g., American Fletcher Mortgage Co., Inc. v. U.S. Steel Credit Corp.,* 635 F.2d 1247 (7th Cir.1980), *cert. denied,* 451 U.S. 911, 101 S.Ct. 1982, 68 L.Ed.2d 300 (1981); *United American Bank v. Gunter,* 620 F.2d 1108 (5th Cir.1980); *Amfac Mortgage Corp. v. Arizona Mall of Tempe, Inc.,* 583 F.2d 426 (9th Cir.1978); *United California Bank v. THC Financial Corp.,* 557 F.2d 1351, 1352 (9th Cir.1977); *McGovern Plaza Joint Venture v. First of Denver Mortgage Investors,* 562 F.2d 645 (10th Cir.1977); *C.N.S. Enterprises Inc. v. G. & G. Enterprises, Inc.,* 508 F.2d 1354 (7th Cir.), *cert. denied,* 423 U.S. 825, 96 S.Ct. 38, 46 L.Ed.2d 40 (1975); *McClure v. First Nat'l Bank,* 497 F.2d 490 (5th Cir.1974), *cert. denied,* 420 U.S. 930, 95 S.Ct. 1132, 43 L.Ed.2d 402 (1975); *Bellah v. First Nat'l Bank,* 495 F.2d 1109 (5th Cir.1974); *Provident Nat'l Bank v. Frankford Trust Co.,* 468 F.Supp. 448 (E.D.Pa.1979); *Tri-County State Bank v. Hertz,* 418 F.Supp. 332 (M.D.Pa.1976). Only once, however, has the business of the provider of funds been made an explicit basis for decision. In *Great Western Bank & Trust v. Kotz,* 532 F.2d 1252 (9th Cir.1976), the Ninth Circuit held that the plaintiff bank had made a loan rather than purchased a security. Judge Wright concurred on the ground that banks are generally not investors:

(d) the person to whom the investor provides funds is merely the investor's agent; [17] or

(e) the transaction is virtually risk-free to the investor by reason of governmental regulation.

The question is whether Wolf's peso accounts fall within any of the exclusions.

> In an investment situation, the issuer has superior access to and control of information material to the investment decision. Rather than relying solely on semi-anonymous and secondhand market information, as do most investors, the commercial bank deals "face-to-face" with the promisor. The bank has a superior bargaining position and can compel wide-ranging disclosures and verification of issues material to its decision on the loan application.

*Id.* at 1262.

The situation described in *Kotz* is to be distinguished from that presented in *Exchange Nat. Bank v. Touche Ross & Co., supra.* Although the transaction there also involved a bank, it consisted of the bank's purchase of notes from a brokerage firm, implemented not through normal lending channels but by its chief administrative officer in order to develop a closer relationship with the firm. Moreover, the funds were to become a part of the firm's capital in accordance with stock exchange requirements. These and other characteristics led the court to find that the notes were securities.

**17.** The concept of agency is relevant in a number of contexts. One of them has been discussed already—the purchase of real estate attended by collateral management agreements. *See* note 14 *supra.* If the landowner retains ultimate control but "does not wish to manage a property himself and delegates the responsibility to an agent," he does not hold a security. *Schultz v. Dain Corp.,* 568 F.2d 612, 615 (8th Cir.1978).

A general partnership (or a share in a joint venture) is not a security; the partners are mutual agents. *See Williamson v. Tucker,* 645 F.2d 404 (5th Cir.), *cert. denied,* 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981); *Hirsch v. DuPont,* 396 F.Supp. 1214 (S.D.N.Y.1975), *aff'd,* 553 F.2d 750 (2d Cir.1977); *Oxford Finance Co. v. Harvey,* 385 F.Supp. 431 (E.D.Pa. 1974).

A discretionary trading account in commodities is not a security. *Brodt v. Bache & Co.,* 595 F.2d 459 (9th Cir.1978). According to the Ninth Circuit, the investor in such accounts does not put his funds into a "common enterprise" as required by the *Howey* doctrine because the investor may lose money while his broker earns a substantial commission. But there is no requirement that the holder of a

Only exclusion (e) could apply to these accounts. The rationale of that exclusion is that the protection afforded by the securities acts is not needed because other governmental regulation largely eliminates risks that would otherwise be faced by the "investor." *See Weaver,* 102 S.Ct. at 1224–25.[18] See also *United Housing Foundation,*

security gain or lose in proportion to the enterprise in which he invests; if there were, the bonds of a faltering company would not be securities. A commodities account is indeed an individual enterprise, but for a different reason: the broker is a mere agent of the investor. His judgment is substituted for that of the provider of funds on whose behalf he acts. The investor delegates authority; he does not invest in the brokerage house. *See also McCurnin v. Kohlmeyer & Co.,* 340 F.Supp. 1338 (E.D.La.1972); *Sinva, Inc. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.,* 253 F.Supp. 359 (S.D.N.Y.1966).

The concept of agency also explains, for example, the decision in *SEC v. Energy Group of America, Inc.,* 459 F.Supp. 1234 (S.D.N.Y.1978) (service assisted customers in BLM lottery for oil and gas leases).

**18.** The rationale which appears to underlie *Weaver* is that government regulation sufficiently mitigates the risks to which the investor is exposed to obviate the need to apply the securities acts. That rationale has validity when applied to the issuance by the bank of the certificate of deposit to the Weavers, inasmuch as it is the risks faced by the Weavers in that transaction against which government regulation protects. The *Weaver* case, however, involved the pledge by the Weavers to the bank of the certificate as security for a loan to third parties, and the alleged fraud by the bank to induce that pledge. It is difficult to see (assuming the pledge to be a "purchase or sale" within the meaning of the acts) how government regulation could have protected the Weavers against the alleged fraud in that transaction.

It can of course be argued that once an instrument is found to be a security within the meaning of the acts, it retains that character throughout subsequent transactions, including pledges. The converse, however, is not necessarily true. *But see Weaver,* 102 S.Ct. at 1225 n. 9 (rejecting summarily "respondent's argument that the certificate of deposit was somehow transformed into a security when it was pledged even though it was not a security when purchased"). That an instrument presumptively a security is treated as exempt when issued because of the protection afforded the investor through government regulation in that transaction does not necessarily mean that it should also be exempt in later transactions in which no such protection is afforded.

*Inc. v. Forman, supra,* 421 U.S. at 857, 95 S.Ct. at 2063, where the Court, in a footnote, rejected the application of the "risk capital" approach to the facts of the case because the purchasers of the apartments "take no risk in any significant sense;" if dissatisfied, they could recover their initial investment, and state regulation and nearly total state financing made bankruptcy an "unrealistic possibility." And see *SEC v. Variable Annuity Life Insurance Co.,* 359 U.S. 65, 77, 90–91, 79 S.Ct. 618, 625, 631–632, 3 L.Ed.2d 640 (1959) (Brennan, J., concurring) (variable annuity contracts are securities because the risks of insolvency against which state insurance regulation protects differ from the risks of fluctuating values of share interests for which the protection afforded by the securities acts is needed).

■ In this case it is not contested that Mexico thoroughly regulates its banks and that no Mexican bank has become insolvent in fifty years. That is not enough, however, to make Wolf's investment virtually free of risk. Indeed, governmental regulation has no effect on the essential risk to which an investor in foreign time deposits is exposed—the risk of devaluation.[19] Because the rationale of *Weaver* is inapplicable here, the Court holds that plaintiff's time deposits were securities.

*Liability Under The 1933 Act*

■ Section 12(1) of the Securities Act provides that any person who offers or sells an unregistered security "shall be liable to the person purchasing such security from him, who may sue ... to recover the consideration paid for such security with interest thereon, less the amount of any income

received thereon, upon the tender of such security, *or for damages if he no longer owns the security."* 15 U.S.C. § 77*l*(1) (emphasis added). Liability under this section is "absolute"; a purchaser may recover damages "regardless of whether he can show any degree of fault, negligent or intentional, on the seller's part." *Lewis v. Walston & Co.,* 487 F.2d 617, 621 (5th Cir. 1973) (Wisdom, J.); *see also Mason v. Marshall,* 412 F.Supp. 294, 300 (N.D.Tex.1974) (plaintiff need not prove materiality of information in registration statement or probability that he would have relied on it), *aff'd,* 531 F.2d 1274 (5th Cir.1976).

■ Liability under § 12(1) is established by proof that: (1) the securities were not registered; (2) the defendant sold the securities to the plaintiff; and (3) the mails were used in making the sale. *Lewis v. Walston & Co., supra,* 487 F.2d at 621. There is no dispute as to any of these elements of liability. Accordingly, plaintiff's motion for summary judgment is granted and defendant's cross-motion is denied. The parties will bear their own costs.

IT IS SO ORDERED.

---

*Weaver* presents the relatively rare case of a fraud allegedly committed by, rather than against a person in the business of lending funds in commercial transactions. *See* exclusion (c), *supra.* It suggests the need for an independent analysis whenever the securities acts are invoked not by the person providing the funds but by another party to the transaction.

**19.** That type of risk is specifically identified in the SEC's Regulation S–K governing registration statements under the 1933 Act:

10. Foreign private registrants should also discuss briefly any pertinent governmental economic, fiscal, monetary, or political policies or factors which have materially affected or could materially affect, directly or indirectly, company operations or investments by United States nationals.

17 C.F.R. § 229.20, Item 11, Instruction 10.