**R.J. WOLF, Plaintiff-Appellee,**

v.

**BANCO NACIONAL de MEXICO, S.A., a/k/a Banamex, Defendant-Appellant.**

**No. 84–1693.**

United States Court of Appeals,
Ninth Circuit.

Submitted March 23, 1984.

Decided Aug. 10, 1984.

R.J. Wolf, San Rafael, Cal., for plaintiff-appellee.

David W. Steuber, Philip Heller, Paul, Hastings, Janofsky & Walker, Los Angeles, Cal., for defendant-appellant.

Before DUNIWAY, WALLACE, and PREGERSON, Circuit Judges.

DUNIWAY, Circuit Judge:

The main issue in this appeal is whether a certificate of deposit for pesos, issued through interstate commerce to a United States resident by a Mexican bank, is a "security" for purposes of the federal securities laws. The holder of the certificate sued the bank after a devaluation of the Mexican currency shrank the dollar value of his investment. The district court found that the certificate was a security within the Securities Act of 1933 and, because the certificate was not registered, granted summary judgment against the bank. We reverse.

## I. *Facts.*

Plaintiff R.J. Wolf read advertisements in California newspapers for certificates of deposit, in pesos, offered by Banco Nacional de Mexico (Banamex), a publicly held Mexican bank. Wolf wrote for more information, and the bank sent him through United States mail a brochure, which discussed a "bright future ... forecast for Mexico and for investors in general." The brochure explained that "persons residing outside of Mexico," such as Wolf, could open a time deposit account by providing Banamex in writing with the following:

1). Amount you wish to invest by type of investment.

2). Enclose bank draft, personal check or cashier's check covering amount of investment(s). Checks made out to the order of Banco Nacional de Mexico, S.A. (BANAMEX) preferably in U.S. dollars or Mexican pesos.

Checks sent in U.S. dollars or other currencies for investments in Mexican pesos will be converted into Mexican pesos at the rate of exchange prevailing in the Mexican money market on the day your check is received.

Under the heading "Exchange rates and controls," the brochure stated,

Mexico has no exchange controls which means your interest and principal can be remitted to you freely and without hindrance, in the currency of your choice.

The Mexican peso, like the U.S. dollar, is a floating currency which means that the rate of exchange between the peso and the currency you request your interests [sic] and principal to be paid to you in could vary upwards(2) or downwards between the time you purchase your Time Deposit and maturity. However, since 1977 the Banco de Mexico, Mexico's Central Bank, has maintained a stable peso-dollar parity by intervening in the money market.

In 1981, Wolf invested a total of $60,000 in one 6-month and two 3-month peso certificates of deposit of the bank, which he purchased with personal checks drawn on domestic banks in dollars, and mailed by him to the Banamex branch in Tijuana, Mexico. The certificates guaranteed him returns of 33.9 percent, 31.4 percent, and 32.75 percent interest, respectively. The accounts were uninsured, non-negotiable, and not withdrawable. As part of the deposit agreement, Banamex paid Wolf monthly interest, in pesos, which it converted to dollars.

Before the accounts matured, Mexico's central bank, roughly equivalent to the United States Federal Reserve Bank, abruptly ceased intervening in the money market to support the value of the peso. The peso quickly lost value. As a result, at the end of the certificates' terms, Banamex paid Wolf the number of pesos to which the certificates entitled him, but they were converted into substantially fewer dollars. He received only $35,536 of his original $60,000 investment.

Wolf sued in federal court, alleging that Banamex sold him unregistered securities in violation of the Securities Act of 1933, 15 U.S.C. § 77*l* (1), and misled him in violation of the Act, § 77q(a)(2). He also alleged common law fraud and violation of California securities laws.

The district court granted summary judgment in favor of Wolf under the Securities Act, finding Banamex strictly liable for selling unregistered securities under 15 U.S.C. § 77*l* (1). 549 F.Supp. 841. We dismissed Banamex's appeal from that order

because the judgment entered was not final under 28 U.S.C. § 1291. 721 F.2d 660. On remand, the district court granted Banamex's motion to certify the order for interlocutory appeal under 28 U.S.C. § 1292(b), and entered appropriate findings. We now reach the merits.

## II. *Sovereign Immunity.*

Banamex claims immunity from suit under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 *et seq.* That statute would not have protected Banamex, as a publicly held bank, in the early stages of this suit, but on September 1, 1982, the government of Mexico nationalized the bank. The court could have declined to consider Banamex's claim of immunity on the ground that the bank waived the defense by not raising it promptly below, as required by 28 U.S.C. § 1605(a)(1).

The trial court heard the motions for summary judgment on September 3, 1982, two days after the bank was nationalized. Although Banamex's counsel apparently referred in passing to the nationalization, he did not discuss sovereign immunity at that hearing. Neither did Banamex raise the issue in its supplemental memorandum in support of summary judgment, filed September 9, nor in its motion for reconsideration or new trial of November 5, 1982. It finally raised the issue for the first time in its motion to stay proceedings to enforce the judgment, filed January 14, 1983. The court could have held that by bypassing the issue in the summary judgment proceedings Banamex had forgone the opportunity to raise the issue. 28 U.S.C. § 1605(a)(1); *Rothman v. Hospital Service of Southern California,* 9 Cir., 1975, 510 F.2d 956, 960.

On remand, the district court did consider the issue. It denied Banamex's motion to stay, on the ground that the commercial activity exception of the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605(a)(2) applies. *See Verlinden B.V. v. Central Bank of Nigeria,* 1983, 461 U.S. 480, 103 S.Ct. 1962, 76 L.Ed.2d 81; *Texas Trading & Milling Corp. v. Federal Republic of Nigeria,* 1 Cir., 1981, 647 F.2d 300. *Cf. MOL, Inc. v. Peoples Republic of Bangladesh,* 9 Cir., 1984, 736 F.2d 1326, 1328. In our case, the sale of the certificate of deposit by Banamex to Wolf was clearly "a commercial activity carried on in the United States" by Banamex, within the meaning of § 1605(a)(2). The district court was right.

## III. *Definition of "Security."*

### A. *The* Weaver *case.*

Section 77b of Title 15, as amended in 1982, defines "security" for the purposes of the Securities Act of 1933. It states:

When used in this subchapter, unless the context otherwise requires—

(1) The term "security" means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or, in general, any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

As the district court noted, no other court has resolved the question of whether a certificate of deposit issued by a foreign bank is a security within the federal securities acts. But the Supreme Court held in *Marine Bank v. Weaver,* 1982, 455 U.S. 551, 102 S.Ct. 1220, 71 L.Ed.2d 409, that a similar certificate of deposit issued by a *domestic* bank was not a security for purposes of the Securities Exchange Act of 1934. The parties cite to us numerous "tests" used by this Court and others to

define a "security" in other cases, *e.g.*, the "economic realities" test, *Securities & Exchange Commission v. W.J. Howey Co.*, 1946, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244, and *United Housing Foundation, Inc. v. Forman*, 1975, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621, the "risk capital" test, *Great Western Bank & Trust v. Kotz*, 9 Cir., 1976, 532 F.2d 1252, *see Landreth Timber Co. v. Landreth*, 9 Cir., 1984, 731 F.2d 1348, 1352; and the "commercial/investment" test, *Bellah v. First National Bank of Hereford*, 5 Cir., 1974, 495 F.2d 1109.

However, when the Supreme Court, in *Marine Bank v. Weaver*, has so recently applied the definition to facts very similar to those in the case before us, we are bound by its reasoning there, to the exclusion of criteria articulated in other contexts. *Cf. Meason v. Bank of Miami*, 5 Cir., 1981, 652 F.2d 542 (pre-*Weaver*, reversing trial court's dismissal of securities claim in sale of a foreign bank's certificate of deposit and directing consideration of commercial/investment test on remand); *Canadian Imperial Bank of Commerce Trust Co. v. Fingland*, 7 Cir., 1980, 615 F.2d 465 (pre-*Weaver*, affirming dismissal of securities fraud charged in sale of foreign bank certificate of deposit).

Before proceeding, we note that the *Weaver* Court analyzed the status of a bank certificate of deposit as a security under the Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(10). That does not reduce *Weaver*'s applicability because "the definition of 'security' in the 1934 Act is essentially the same as the definition of 'security' in § 2(1) of the Securities Act of 1933. 15 U.S.C. § 77(b)(1)." *Weaver*, 455 U.S. at 555, n. 3.

Plaintiffs in *Weaver* held a $50,000, six-year certificate of deposit issued by a federally regulated Pennsylvania bank. The certificate paid 7½% interest, although the bank could charge an interest penalty upon early withdrawal of the principal. The holders had pledged the certificate as security for a bank loan to a packing company. After the packing company failed and the bank prepared to claim the certificate of deposit, the holders sued, alleging, *inter*

*alia*, that the bank had violated the antifraud provisions of the 1934 Act, 15 U.S.C. § 78j(b).

On appeal from the Third Circuit, the Court held that the certificate of deposit was not a security. It said that there was an "important difference" between the certificate and other long-term debt obligations that might be securities:

> This certificate of deposit was issued by a federally regulated bank which is subject to the comprehensive set of regulations governing the banking industry. Deposits in federally regulated banks are protected by the reserve, reporting, and inspection requirements of the federal banking laws; advertising relating to the interest paid on deposits is also regulated. In addition, deposits are insured by the Federal Deposit Insurance Corporation. Since its formation in 1933, nearly all depositors in failing banks insured by the FDIC have received payment in full, even payment for the portions of their deposits above the amount insured.

455 U.S. at 558, 102 S.Ct. at 1224, footnotes and citation omitted.

The Court observed that while the holder of an ordinary long-term debt "assumes the risk of the borrower's insolvency," government banking regulations "virtually guaranteed" that the holder of a Marine Bank certificate of deposit would be repaid in full. *Ibid.* It concluded,

> The definition of "security" in the 1934 Act provides that an instrument which seems to fall within the broad sweep of the Act is not to be considered a security if the context otherwise requires. It is unnecessary to subject issuers of bank certificates of deposit to liability under the antifraud provisions of the federal securities laws since the holders of bank certificates of deposit are abundantly protected under the federal banking laws. We therefore hold that the certificate of deposit purchased by the Weavers is not a security.

*Id.* at 558–559, 102 S.Ct. at 1225. The Court added, however, "It does not follow that a certificate of deposit ... invariably

falls outside the definition of a 'security' as defined by the federal statutes. Each transaction must be analyzed and evaluated on the basis of the content of the instruments in question, the purposes intended to be served, and the factual setting as a whole." *Id.* at 560, n. 11, 102 S.Ct. at 1225 n. 11.

In its analysis of *Weaver*, the district court thought it crucial that Marine Bank was regulated by the United States government, and held that because *federal* banking laws do not regulate Banamex, *Weaver* did not control. We do not read *Weaver* so narrowly. The Court referred there to "federally regulated bank" and "federal banking laws" because the case arose in that context. We think that the Court found it significant that the issuing bank was regulated, and regulated adequately, not that it was the federal government that regulated it. Therefore, it was because repayment in full was "virtually guaranteed" and the certificate holders were "abundantly protected" that the certificates of deposit were outside the definition of "security" and the protection of the federal securities acts.

It was conceded below that "Mexico thoroughly regulates its banks and that no Mexican bank has become insolvent in fifty years." 549 F.Supp. at 853. The district judge thought that irrelevant, however, because "plaintiff assumed ... the much more substantial risk of a currency devaluation." *Id.* at 845. Because a currency devaluation might prevent repayment of Wolf's principal from being "virtually guaranteed," the district court held the reasoning of *Weaver* inapplicable. We disagree. As the district court recognized, *id.* at 853, even the federal banking regulations present in *Weaver* would not have protected a depositor there against devaluation risk. If Wolf had purchased $60,000 worth of Mexican pesos from a United States bank and used them to buy a peso certificate of deposit from that bank, he would have suffered precisely the same loss that he is complaining about in this case. A resident of Germany who, in 1970, used deutsche marks to purchase through the mail a certificate of deposit of dollars

from Marine Bank would have suffered the same type of loss, when the bank repaid him after the devaluations of the dollar in 1971 and 1973, as Wolf alleges here. The federal regulations and deposit insurance that were so important to the Court in *Weaver* would not in any way have protected this hypothetical depositor from losses caused by the devaluation. Whether a bank's certificate of deposit is a security surely cannot turn on the currency with which it is purchased or in which it is payable. The devaluation risk present whenever a certificate of deposit is purchased with or payable in a foreign currency therefore does not distinguish the certificates that Wolf bought from that which the Weavers bought.

**B.** *The 1982 amendments.*

The parties direct our attention to certain amendments to the 1933 and 1934 securities acts, enacted after *Weaver* was decided in 1982. In relevant part, the amendments inserted into the definitional sections of the two Acts the language:

> ["security" means ...] any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities....

15 U.S.C. §§ 77b(1), 78c(a)(10), Pub.L. 97–303, §§ 1, 2, 96 Stat. 1409. The purpose of the amendments was to expressly include various types of options within the definition of "security" and to make clear the exclusive jurisdiction of the Securities and Exchange Commission over them. H.Rep. No. 97–626 at 2, 9, 97th Cong., 2d Sess., reprinted in (1982) U.S.Code Cong. & Ad. News 2780, 2780, 2788.

The House Report described *Weaver* as "holding that, under the circumstances of the case, a certificate of deposit issued by a bank subject to regulation by a domestic bank regulatory agency is not a security" under the 1934 Act. *Id.* at 10, (1982) U.S. Code Cong. & Ad.News at 2788. Wolf argues that the House Report, which acknowledges that *Weaver* left "open the question of whether a certificate of deposit could be a security in another context," *id.*,

indicates that Congress meant by the amendments to permit security treatment of other certificates in other contexts, specifically those not regulated by a "domestic bank regulatory agency." He contends that Congress has always distinguished between instruments issued by foreign banks and those issued by domestic banks. *See* 15 U.S.C. § 77c(a)(2) (exempting "any security issued or guaranteed by any [domestic] bank" from registration requirements).

Banamex, on the other hand, argues that Congress "codified" the holding of *Weaver* that a certificate of deposit was not a security. It contends that if Congress had meant to "overrule" the holding of *Weaver*, it would have simply amended the acts to read "or privilege on any security, *including* a certificate of deposit, or group or index of securities." *See* 1982 Amendment to the Investment Company Act of 1940, 15 U.S.C. § 80a–2(a)(36), Pub.L. 97–303, § 5, 96 Stat. 1409; H.Rep. at 10, (1982) U.S. Code Cong. & Ad.News at 2788. Instead, the bank argues, Congress juxtaposed the terms "security" and "certificate of deposit" in such a way as to distinguish them.

As we read the amendments, they do not dispose of the question before us. The legislative history demonstrates that Congress recognized the validity of the precise holding of *Weaver* on its facts, but at the same time, it also recognized that a different outcome might result in another context. We see little in the amendments or their legislative history to guide us in determining the outcome in the context before us.

### C. *Applying the Weaver "insolvency protection" test.*

■ Our decision, therefore, is compelled by the reasoning of *Weaver* that when a bank is sufficiently well regulated that there is virtually no risk that insolvency will prevent it from repaying the holder of one of its certificates of deposit in full, the certificate is not a security for purposes of the federal securities laws.

■ There remains the matter of how such regulation is to be proved. The Supreme Court in *Weaver* was able to take judicial notice of the breadth and adequacy of the federal regulations protecting the holder of a certificate of deposit issued by Marine Bank. In a situation such as the case before us, where a foreign government's regulatory structure is implicated, the trial court must hear evidence on the degree of protection that structure offers a depositor against insolvency. Because the foreign bank in this situation has better access to such evidence than the certificate holder, the bank shall bear the burden of proving such regulation, as an affirmative defense to a securities law charge. If the adequacy of the regulatory structure is proved, a certificate of deposit issued in a customary banking transaction is not, under *Weaver*, a security.

In the case before us, it was conceded that the Mexican government's regulation of Banamex provides its certificate holders the same degree of protection against insolvency as does the federal system in this country. The record shows that Banamex, like all Mexican banks, is supervised by the Banco de Mexico, the National Banking Commission, and the Ministry of Finance and Public Credit. Banamex must adhere to paid-in capital and reserve requirements, and its advertising is subject to the prior approval of the National Banking Commission. It is required to publish monthly financial statements, which must be submitted for approval by the National Banking Commission. That commission also audits the bank annually. Although there was at the relevant time no deposit insurance program, no Mexican bank has failed in the past 50 years. In the event of such a failure, moreover, deposits, including certificates of deposit, by law would constitute preferential claims against all other obligations. *See* 549 F.Supp. at 853. The depositors in a Mexican bank, therefore, have been "virtually guaranteed" of repayment in full to the same degree as those in United States banks, who are guaranteed of repayment by the Federal Deposit Insurance Corporation, with certain restrictions, see 12 U.S.C. § 1821(a)(1).

■ Thus, because the government regulations imposed on Banamex provide its certificate holders with protection equiva-

lent to that afforded depositors in the federally regulated Marine Bank, Banamex's certificates of deposit are not securities within the meaning of the federal securities acts. Because we find the certificates are not securities, we need not decide the other issues that Banamex raises on appeal.

The judgment appealed from is reversed and the case is remanded for further proceedings consistent with this opinion.