**BROCKTON SAVINGS BANK, Plaintiff,**

v.

**PEAT, MARWICK, MITCHELL & CO., a Partnership; James Blanton, C. Dean York, and First United Fund, Ltd., Defendants.**

Civ. A. No. 83–0478–N.

United States District Court,
D. Massachusetts.

Dec. 9, 1983.

Richard Zielinski, Michael S. Greco, Hill & Barlow, Boston, Mass., for Brockton Sav. Bank.

Arnold Messing, Csaplar & Bok, Boston, Mass., for Peat, Marwick, Mitchell & Co., James Blanton and C. Dean York.

Richard Dahlen, Dahlen & Gatewood, Boston, Mass., for First United Fund Ltd.

## MEMORANDUM AND ORDER

DAVID S. NELSON, District Judge.

Plaintiff, Brockton Savings Bank (Brockton) seeks to recover losses resulting from its purchase of a certificate of deposit (CD) from Penn Square Bank of Oklahoma (Penn Square). Three of four defendants— Peat, Marwick, Mitchell and Co. (Peat Marwick), a national partnership of Certified Public Accountants, and two of its partners, James Blanton and C. Dean York— move under Fed.R.Civ.P. 12(b)(6) to dismiss this action as to them on the grounds that the complaint fails to state a claim upon which relief can be granted.

After carefully considering the arguments advanced by the parties and accepting as true, as I must, the plaintiff's allegations and all reasonable inferences that may be deduced therefrom, *Walker Process Equip. Inc. v. Food Mach. and Chem. Corp.*, 382 U.S. 172, 174–75, 86 S.Ct. 347, 348–349, 15 L.Ed.2d 247 (1965), I hereby GRANT defendants' motion to dismiss in its entirety.

## FACTS

On April 28, 1982 Brockton purchased a 90-day, $1,000,000 CD from Penn Square. Brockton was holding the CD on July 5, 1982 when the United States Comptroller of the Currency declared Penn Square to be insolvent, and appointed the Federal Deposit Insurance Corporation (FDIC) as receiver. Most pertinent among the events leading to Penn Square's failure and Brockton's consequent loss are the following. In the spring of 1980 the Office of the Comptroller of the Currency reported numerous deficiencies in Penn Square's operations, including rapid and uncontrolled increase in bank loans and assets, insufficient liquidity, violations of banking laws, inadequate funds management and understaffing of the institution. The bank continued to de-

teriorate throughout 1980. In March, 1981, Arthur Young and Co., Penn Square's auditors, issued an opinion which was not totally favorable with respect to the bank's 1980 financial statement, because the accountants could not determine the adequacy of the loan loss reserve due to insufficiency of collateral documentation.

In December 1981, Penn Square fired Arthur Young and Co. and retained Peat Marwick to audit the 1981 financial statement. Peat Marwick issued a favorable opinion with no qualifications in March, 1982 despite the Office of the Comptroller of the Currency's continuing dissatisfaction with the bank's management and Arthur Young and Company's qualified opinion the year before.

In April, 1982 defendant First United Fund (First United), a broker-dealer in money instruments and other securities, telephoned an officer of Brockton to interest the bank in purchasing a CD from Penn Square. Brockton agreed to the purchase of a $1,000,000 CD. Shortly thereafter, Penn Square was declared insolvent and this suit resulted.

## CLAIMS

Brockton alleges that defendant First United made misrepresentations of material fact regarding the condition of Penn Square which prompted Brockton to purchase the CD. Brockton has asserted a number of state and federal claims against First United. Their enumeration is unnecessary because First United is not a party to this motion to dismiss.

Brockton alleges that defendants Peat Marwick, and its partners Blanton and York, issued an unqualified favorable report which was inadequately prepared and made material misrepresentations and omissions. Such deficiencies, Brockton argues, operated as a fraud and deceit on the bank. Brockton, however, does not specifically allege that it read, received or knew of the Peat Marwick report prior to purchasing the CD, nor does it allege that First United had or made reference to the report in its dealings with Brockton.

Brockton brings this action against Peat Marwick, Blanton and York, stating claims for violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder, Section 17(a) of the Securities Act of 1933 and pendent state claims for fraudulent and negligent misrepresentation. These defendants have moved to dismiss all counts under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted. Defendants argue, in part, that Brockton's investment was not a "security" within the meaning of the federal securities laws and that the Complaint fails to state a claim for fraudulent or negligent misrepresentation.

After careful consideration, I find that Brockton's investment was not a "security" within the meaning of the federal securities laws and that the Complaint fails to state a claim for fraudulent or negligent misrepresentation. On these grounds I must grant defendants' motion to dismiss.

## SECURITIES CLAIMS

"The threshold question in any action brought pursuant to the Securities Acts is whether a security exists." *Union Planters National Bank v. Commercial Credit Business Loans, Inc.*, 651 F.2d 1174, 1179 (6th Cir.), *cert. denied*, 454 U.S. 1124, 102 S.Ct. 972, 71 L.Ed.2d 111 (1981). The Securities Act of 1933, 15 U.S.C. § 77b(1), provides:

When used in this subchapter, unless the context otherwise requires—

(1) The term "security" means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, floating-trust certificate, certificate of deposit for security, fractional undivided interest in oil, gas, or other mineral rights, ... or, in general, any interest or instrument commonly known as a "security," or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

The definition of a security under the Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(10), is virtually identical. *Tcherepnin v. Knight*, 389 U.S. 332, 342, 88 S.Ct. 548, 556, 19 L.Ed.2d 564 (1967).

Although the certificate of deposit at issue in this case is not included specifically in the statutory definition,[1] the definition is adaptable to the "countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Securities and Exchange Commission v. Howey Company*, 328 U.S. 293, 294, 66 S.Ct. 1100, 1101, 90 L.Ed. 1244 (1946). However, Congress, in enacting the securities laws, did not intend to provide a broad federal remedy for all fraud. *Marine Bank v. Weaver*, 455 U.S. 551, 556, 102 S.Ct. 1220, 1223, 71 L.Ed.2d 409 *citing Great Western Bank & Trust v. Kotz*, 532 F.2d 1252, 1253 (9th Cir.1976); *Bellah v. First National Bank*, 495 F.2d 1109, 1114 (5th Cir.1974). Thus, the broad statutory definition of a security is preceded by the statement that the terms mentioned are not to be considered securities if "the context otherwise requires ..."

In 1982, in *Marine Bank v. Weaver*, 455 U.S. at 559, 102 S.Ct. at 1225, the Supreme Court held that a certificate of deposit issued by a federally regulated national bank is not a security under the federal securities laws. The instrument at issue in *Weaver* was a $50,000 CD with a 6-year maturity paying 7½% interest; the CD was issued by a federally regulated bank and was insured by the FDIC. The *Weaver*

---

**1.** The definition of a security in the Securities Acts includes the term "certificate of deposit for security." However, this term does not refer to the certificate of deposit purchased by Brockton. Rather, "certificate of deposit for security" refers to instruments issued by protective committees in the course of corporate reorganizations. *Marine Bank v. Weaver*, 455 U.S. 551, 557 n. 5, 102 S.Ct. 1220, 1224 n. 5, 71 L.Ed.2d 409 (1982), *citing Canadian Imperial Bank of Commerce v. Fingland*, 615 F.2d 465, 468 (7th Cir. 1980).

court found a crucial difference between this bank CD and other long-term debt obligations subject to the federal securities laws. *Weaver,* 455 U.S. at 557–58, 102 S.Ct. at 1224–25. Unlike other debt instruments, such as corporate bonds, the Court said:

> This certificate of deposit was issued by a federally regulated bank which is subject to the comprehensive set of regulations governing the banking industry. Deposits in federally regulated banks are protected by the reserve, reporting, and inspection requirements of the federal banking laws; advertising relating to the interest paid on deposits is also regulated. In addition, deposits are insured by the Federal Deposit Insurance Corporation.

> \*   \*   \*   \*   \*   \*

> It is unnecessary to subject issuers of bank certificates of deposit to liability under the antifraud provisions of the federal securities laws since the holders of bank certificates of deposit are abundantly protected under the federal banking laws. (455 U.S. at 558–59, 102 S.Ct. at 1224–25) (footnotes omitted)

*Weaver* would appear to be dispositive of plaintiff's attempts to characterize the instrument in question as a security. The instrument purchased by Brockton was a $1,000,000 certificate of deposit with a 90-day maturity paying interest at 16%; it was issued by a federally regulated bank and insured by the FDIC. Little distinguishes this certificate of deposit from the one held not to be a security in *Weaver.*

Plaintiff makes an admirable but unavailing attempt to distinguish the *Weaver* holding, relying on a footnote in *Weaver* as support for its contention that the certificate of deposit in question is not necessarily outside the scope of the definition of a security. The *Weaver* Court said:

> It does not follow that a certificate of deposit or business agreement between transacting parties invariably falls outside the definition of a "security" as defined by the federal statutes. Each transaction must be analyzed and evalu-

ated on the basis of the content of the instruments in question, the purposes intended to be served, and the factual setting as a whole. *Weaver,* 455 U.S. at 560 n. 11, 102 S.Ct. at 1225 n. 11.

With the toehold provided by this footnote, Brockton attempts to escape the *Weaver* holding. Brockton alleges that the instrument in question, rather than being an ordinary CD is "in effect an investment in a common enterprise consisting of Penn Square and its oil and gas borrowers," the security of which "depended directly or indirectly on the success of the oil and gas ventures involved in this common enterprise." Complaint, ¶ 33.

Brockton's re-characterization of its investment parrots the definition of a security in *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975). The Court in *Forman* said, "[t]he touchstone [in determining whether an instrument is a security] is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." *Forman,* 421 U.S. at 852, 95 S.Ct. at 2060, *citing S.E.C. v. W.J. Howey Co.,* 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946).

Brockton's CD, even re-characterized, does not meet the *Forman* test. As defendants correctly argue, when Brockton purchased the CD, it could not have had any "reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." Rather, the bank could have expected nothing more than the return of its deposit with interest at a contracted rate; such a return was not dependent at all upon the issuer's profits.

Ironically, after parroting the *Forman* definition in its own argument, Brockton objects to its application by defendants. The *Forman* definition, Brockton argues, focused on equity and not debt instruments. Therefore, plaintiffs contend that under defendants' *Forman* analysis no debt instruments, such as bonds and deben-

tures, would ever be covered by the securities acts because the return on such investments is not tied to the issuer's profits. Instead, Brockton argues, the question of whether a debt instrument is a security must be determined by a standard which looks at the risk associated with the transaction, rather than the relationship to the issuer's profits. *Id.* Essentially, Brockton is eschewing the *Forman* "expectation of profit" test in favor of the "risk capital" test advanced by the Ninth Circuit in *El Khadem v. Equity Securities Corp.*, 494 F.2d 1224 (9th Cir.), *cert. denied*, 419 U.S. 900, 95 S.Ct. 183, 42 L.Ed.2d 146 (1974).

Under the risk-capital test, a financial instrument such as a bond may be found to be a security where risk of loss, although not profits, depends on the efforts of others. *Id.* at 1229. While this alternative to *Forman* can perhaps be better applied to debt securities, it has not been endorsed by the Supreme Court. *Wolf v. Banco Nacional De Mexico*, 549 F.Supp. 841 (N.D. Cal.1982). However, such lack of endorsement—as opposed to a direct rejection— does not prevent this court from applying the risk-capital test.

Curiously, after arguing for the risk-capital test, plaintiff does not apply it to the facts at hand. This court, having done so, agrees with defendants' analysis. Essentially, Brockton's risk was a depositor's risk. A bank depositor such as Brockton, unlike holders of stocks and bonds, does not face the risk that the principal value of its investment will decline. Rather, a bank depositor's only risk is that the accepting bank will become insolvent. Such a risk does not transform a bank deposit, such as Brockton's CD, into a security especially in view of the virtually complete assurance of repayment depositors enjoy. *Weaver*, 455 U.S. at 558, 102 S.Ct. at 1224 (1981).

Under any definition or test it becomes apparent that the instrument in question is nothing more than a certified deposit of funds from which plaintiff could expect a fixed return at a fixed rate barring Penn Square's insolvency. Unlike stockholders, plaintiff has no expectation of profit as a result of the efforts of others and unlike bondholders plaintiff has no risk of loss as a result of the efforts of others, short of total bank insolvency. While Penn Square may have imprudently lent depositors' funds to risky outside oil and gas ventures such action does not transform bank deposits, such as Brockton's, into investments protected by the securities laws. Plaintiff's deposit is "abundantly protected" by the banking laws and remedy must be sought there.

Plaintiff's further attempts to distinguish the holding in *Weaver* are also unavailing. First, plaintiff says that the certificate of deposit in *Marine Bank* had a face value of $50,000 whereas Brockton's instrument had a face value of $1 million. Based on this, plaintiff argues that since the *Weaver* Court noted that the certificate of deposit at issue was insured and that "the purchaser of a certificate of deposit is virtually guaranteed payment in full," *Weaver*, at 558, 102 S.Ct. at 1224, the Court meant only to exclude certificates of deposit up to the ceiling of federal insurance from coverage by the securities law.

Brockton misconstrues *Weaver*. The *Weaver* Court's reference to "payment in full" was not to the insurance coverage but rather to the historical fact of FDIC reimbursement: "Since its formation in 1933, nearly all depositors in failing banks insured by the FDIC have received payment in full, even payment for the portions of their deposits above the amount insured. 1980 Annual Report of the Federal Deposit Insurance Corporation 18–21 (1981)." *Weaver*, 455 U.S. at 558, 102 S.Ct. at 1224. Contrary to Brockton's contention, the *Weaver* Court was *not* drawing any lines concerning the face value of a certificate of deposit as it relates to FDIC coverage, and the definition of a security.

Plaintiff next argues that, while it may be wise not to subject *banks* to both SEC and federal banking law regulation in the case of an ordinary CD, such a policy makes little sense in the case of *accountants* because they are not subject to the federal banking laws. Brockton contends

that accountants should not be able to avoid federal regulation under the federal *securities* laws for fraudulent misrepresentation on the fortuitous happenstance that their client is a bank subject to regulation under the federal *banking* laws. Plaintiff's argument misses the mark. As defendants correctly argue, the presence of a security and the existence of fraud are separate questions in any given case. The instrument in question must be found to be a security before recovery under the securities laws can be sought for the alleged fraud of accountants, bankers or anyone else involved with the instrument. Brockton's CD does not become a "security" simply because fraud on the part of Peat Marwick has been alleged.

Brockton next contends that the recent holding in *Wolf v. Banco Nacional De Mexico,* 549 F.Supp. at 853, implies that even after *Weaver* the circumstances of each transaction involving a CD must be carefully analyzed, therefore precluding a motion to dismiss. The *Wolf* Court, finding *Weaver* inapplicable, held that certificates of deposit in a *foreign* bank were securities. The court found, essentially, that a transaction in which one person provides funds to another with the expectation of a financial or economic benefit is a security unless it falls under one or more listed exclusions. *Wolf,* 549 F.Supp. at 851 (footnotes omitted). The exclusions are:

(1) the benefit derives largely from the managerial efforts of the investor; or

(2) the investor receives something of intrinsic value which he intends to use or consume; or

(3) the provider of funds is in the business of lending funds in such transactions; or

(4) the person to whom the investor provides funds is merely the investor's agent; or

(5) the transaction is virtually risk-free to the investor by reason of governmental regulation.

*Wolf,* 549 F.Supp. at 851–52.

The *Wolf* Court determined that the plaintiff's CD did not, on its face, come within the first four exclusions and that it did not fall under the fifth exclusion because of the risk of currency devaluation in foreign investments:

"In this case it is not contested that Mexico thoroughly regulates its banks and that no Mexican bank has become insolvent in five years. That is not enough, however, to make Wolf's investment virtually free of risk. Indeed, governmental regulation has no effect on the essential risk to which an investor in foreign time deposits is exposed—the risk of devaluation. Because the rationale of *Weaver* is inapplicable here, the Court holds that plaintiff's time deposits were securities." *Wolf,* 549 F.Supp. at 853 (footnote omitted).

In *Wolf,* bank regulation could not protect against the risk of principal devaluation of a foreign time deposit resulting from currency fluctuation. As a result, the rationale behind *Weaver*—that investors in domestic bank instruments are "abundantly protected" by United States bank regulations—was found inapplicable. Brockton's CD, in contrast, was issued by a domestic bank subject to comprehensive federal regulation. *Weaver* is, therefore, fully applicable to Brockton's CD and the holding in *Wolf* is unavailing.

Finally, plaintiff argues that defendants' use of *Canadian Imperial Bank of Commerce v. Fingland,* 615 F.2d 465 (7th Cir. 1980) is inapposite. The long and short of this argument is that the Circuit Court holding in *Fingland*—finding an ordinary domestic CD not to be a security—was superseded by the Supreme Court's more recent decision in *Weaver.* Both plaintiff's and defendants' references to the case are therefore unpersuasive.

■ In view of the dispositive holding of Weaver, I find that Brockton cannot characterize the CD it was issued by a federally regulated bank as a security, despite the arguably risky use to which its funds were put. As the defendants colorfully conclude, "Brockton may be able to allege that it purchased a car with no motor and that the seller was a crook, but it cannot show that the car it purchased was 'in effect' a

bicycle." Plaintiff's claims under the securities laws must be dismissed. .

## FRAUDULENT MISREPRESENTATION CLAIM

■■■ In order to recover in an action for common law fraudulent misrepresentation, plaintiff "must allege and prove that defendant made a false representation of a material fact with knowledge of its falsity for the purpose of inducing plaintiff to act thereon, and that the plaintiff relied upon the representation as true and acted upon it to his damage." *Kilroy v. Barron*, 326 Mass. 464, 465, 95 N.E.2d 190 (1950), *citing Alpine v. Friend Bros. Inc.*, 244 Mass. 164, 167, 138 N.E. 553 (1923). Brockton does not adequately allege the reliance element required in an action for fraudulent misrepresentation. "The recipient of a fraudulent misrepresentation can recover against its maker for pecuniary loss resulting from it if, *but only if,*

(a) he relies on the misrepresentation in acting or refraining from action, and

(b) his reliance is justifiable."

Restatement of Torts (Second), § 537 (1977); *see also Bennett, Inc. v. Charlestown Sav. Bank*, 3 Mass.App. 753, 328 N.E.2d 527 (1975). While Brockton is correct that "[r]eliance may be indirect as well as direct," Plaintiff's Brief at 26, *citing* Restatement of Torts (Second), § 553 (1977), the "terms" of the alleged misrepresentation must "be repeated" or its "substance communicated," Restatement of Torts (Second), § 553 (1977), to the complaining party in order for an action to lie. Brockton does not allege in any way that it read, received or even knew of the Peat Marwick report prior to purchasing the CD, nor does it allege that First United, the broker-dealer of the CD, had or made reference to the report in its dealings with Brockton.

Brockton simply alleges that Peat Marwick "knew or should have known" that purchasers, including Brockton, of CD's "would or were likely to rely on" Peat Marwick's report (Complaint, ¶ 43). The hypothetical reliance Brockton pleads is insufficient to meet the reliance requirement.

"If the recipient does not in fact rely upon the misrepresentation, the fact that he takes some action that would be consistent with his reliance on it and as a result suffers pecuniary loss, does not impose any liability on the maker." Restatement of Torts (Second), § 537, comment (a) (1977). Having found that plaintiff has failed to plead adequately the reliance element required in an action for fraudulent misrepresentation I need not reach the other elements of the claim.

## NEGLIGENT MISREPRESENTATION CLAIM

■■■ As with fraudulent misrepresentation, in an action for negligent misrepresentation the reliance of plaintiff on the alleged misrepresentation of defendant must be alleged and proved. Nolan, Massachusetts Practice, Tort Law, Vol. 37, 173 *citing* Restatement of Torts (Second), § 552(a). For the reasons discussed in reference to the claim for fraudulent misrepresentation, I find that plaintiff has not adequately alleged the reliance element in its action for negligent misrepresentation. Having so found, I need not reach the other elements of the claim.

Having found that plaintiff's complaint fails to state a claim against Peat Marwick, Blanton, and York, I hereby GRANT defendants' motion to dismiss in its entirety.