In re STOP & GO OF AMERICA, INC., Debtor.

Harold B. MURPHY, Trustee of Stop & Go of America, Inc., Plaintiff,

v.

STOP & GO SHOPS, INC., Chapter 11 Case No. 84–1597–HL; the Bou-Faro Company; Anthony Boutin and Carmine Decristoforo; Matteo D'Anello, Stephen Winokur, Edward Stone; Precision Brake Co., a/k/a Precision Transmission and Brake Shops; Richard Lauro, Defendants.

Bankruptcy No. 84–1559–HL.
Adv. No. A85–002.

United States Bankruptcy Court,
D. Massachusetts.

April 29, 1985.

Harold B. Murphy, Hanify & King, Boston, Mass., pro se.

Mark B. Morse, Lynch & Greenfield, Providence, R.I. for Carmine DeCristoforo.

Owen Prague, Barron & Stadfeld, Boston, Mass., for Anthony Boutin.

Marshall Newman, Newman & Newman, Boston, Mass., for debtor Stop & Go Shops, Inc.

## MEMORANDUM

HAROLD LAVIEN, Bankruptcy Judge.

On January 7, 1985, the Chapter 11 Trustee (the "Trustee" or "Plaintiff") of Stop & Go of America, Inc. ("S & G of America") filed an Amended Complaint (the "Complaint") seeking legal title to certain franchise contracts and property rights (the "assets") listed in the estate of Stop & Go Shops, Inc. ("S & G Shops"), and to avoid the purported lien asserted by Bou-Faro Company ("Bou-Faro") on the assets. In short, the Trustee requests substantive consolidation on the basis of non-observance of corporate formalities, lack of legitimate business purpose, and/or joint venture.[1] Named as Defendants along with S & G Shops in the Complaint are Stephen Winokur ("Winokur"), Edward Stone ("Stone") and Matteo D'Anello ("D'Anello"), the sole officers, directors and shareholders of S & G of America and S & G Shops, and Carmine DeCristoforo ("DeCristoforo") and Anthony Boutin ("Boutin"), the officers, directors, shareholders, and present holders of the corporate claim, of Bou-Faro, a company that underwent a liquidation pursuant to relevant provisions of the Internal Revenue Code in early 1983, and three others who are not relevant to the present proceeding.

Trial was held on March 19, 1985. Parties were provided with the opportunity to

---

1. Trustee's original complaint included a count seeking a determination that a fraudulent transfer occurred as a result of the events in question (Count I). However, as S & G of America never had possession of the franchise contract, no transfer could have taken place which could form the basis of this count and the Court, prior to trial, dismissed this count. Counts V, VI and VII dealt with Precision Brakes and were reserved for a separate hearing, later.

file briefs. Accordingly, after reviewing the evidence presented, the law, and the briefs of the respective parties, I make the following findings of fact and rulings of law.

In late 1982, Stone, Winokur and D'Anello commenced discussions with Bou-Faro's officers and directors, Boutin and DeCristoforo, to acquire the assets of Bou-Faro, a business that franchised automotive transmission shops involving the repair, rebuilding and overhaul of automatic transmissions under the name "Stop & Go Transmissions" (the "assets"). The negotiations continued from November through February, 1983 and involved a sale of these assets by Bou-Faro to Stone, Winokur and D'Anello for cash and a promissory note secured by the assets. In these initial discussions, it was contemplated that the assets would be put into a corporation to be formed by Stone, Winokur and D'Anello, and that this corporation would execute the promissory note and security interest to Bou-Faro for the assets. Further, the stockholders would pledge their stock to Bou-Faro.

In December, 1982, Bou-Faro introduced the concept of two corporations to be formed by the acquirers. Bou-Faro's proposed structure was that (i) Stone, D'Anello and Winokur would "assign" all their right, title and interest in the trademarks, tradename and franchise contracts acquired from Bou-Faro Company to S & G Shops; (ii) S & G Shops would grant S & G of America, for no consideration, the sole and exclusive license to use the assets and operate under the franchise contracts; (iii) all royalty payments from the contracts would be the property of S & G of America; and (iv) the stock of S & G of America and S & G Shops would be pledged to Bou-Faro as security for the promissory note and Bou-Faro would also have a security interest in the assets.

During the negotiations, Bou-Faro further proposed that there be a written license (the "License Agreement") between S & G Shops and S & G of America providing for the following: (i) all franchise agreements entered into after the sale by Bou-Faro would contain a paragraph that S & G of America was merely a licensee of S & G Shops and that Bou-Faro had a lien on all existing franchise contracts and those acquired thereafter; (ii) the franchise agreements would contain a provision that unless and until Bou-Faro exercised its security rights, the franchisees would have no claim against S & G Shops and, in the event that S & G Shops exercised its rights under the security agreement, the franchisees would not hold S & G Shops liable for the past defaults of S & G of America; (iii) all contracts entered into by S & G of America and all leases and invoices would clearly state that S & G of America was an independent corporation and S & G Shops was not liable for any obligation or debt of S & G of America; and (iv) the F.T.C. Disclosure Statement of S & G of America that was required for prospective franchisees would clearly define the relationship between S & G of America and S & G Shops and disclose that S & G Shops would have no liabilities to franchisees unless and until the License Agreement was terminated and the rights under security agreement were exercised.

Curiously, when the sale by Bou-Faro to Stone, Winokur and D'Anello was consummated on February 11, 1983, although co-counsel for Bou-Faro testified that he had drafted as an important method of assuring disclosure the written License Agreement between S & G Shops and S & G of America, the License Agreement was not executed at the passing, apparently, because counsel for Bou-Faro who handled the passing, testified that he did not consider it to be a matter of concern to Bou-Faro. None of the documents executed on February 11, 1983, or those subsequent thereto, contained any provision requiring the disclosure of the S & G of America/S & G Shops relationship to creditors or franchisees. The only other notice could have been the U.C.C. filings. However these purported documents were, if executed, never filed. Not only was no License Agreement executed, but, in fact, no disclosure of the S & G Shops/S & G of America

relationship was made to creditors or franchisees of S & G Shops during the nearly two years that D'Anello, Stone and Winokur operated the Stop & Go Transmission business. All parties admit that the Bou-Faro's purported lien on the franchise contracts was never perfected by filing appropriate financing statements with the Secretary of State's office, thereby preventing any creditor or franchisee from discovering Bou-Faro's purported lien on the assets. The FTC Disclosure disseminated by S & G of America to prospective franchisees does not disclose the existence of S & G Shops nor its ownership of the franchise contracts. Throughout the FTC Disclosure Statement S & G of America is repeatedly referred to as the *owner* of the franchise rights and contracts. For example, the FTC Disclosure Statement provides:

> On February 11, 1983, Stop & Go of America, Inc., purchased the assets, which included all of the existing License Agreements, from the Bou-Faro Company. Pg. 4; paragraph 1.
>
> The new owners, Stop & Go of America, Inc., presently have 31 "Stop & Go" Licenses.... Pg. 4; paragraph 2.
>
> Stop & Go of America, Inc. is a newly formed Massachusetts corporation created specifically for the purposes of obtaining the assets of the previous owners, the Bou-Faro Company. Pg. 5; paragraph 1.

There was no evidence that DeCristoforo or Boutin, who knew of the need to prepare and distribute to new franchisees the FTC Disclosure Statements, ever asked to examine them to be sure of any appropriate disclosure.

S & G of America's creditors and franchisees were generally unaware of S & G Shops' existence and interest in the assets acquired from the Bou-Faro Company until after the Chapter 11 Petitions were filed by S & G of America and S&G Shops. All franchise agreements executed by Stone, Winokur and D'Anello subsequent to the sale by Bou-Faro did not disclose the existence or ownership interests of S & G Shops.

■ All payments due Bou-Faro for the sale to Stone, Winokur, D'Anello were made by S & G of *America.* Finally, S & G Shops never conducted business, had no funds, had no office, no telephone listing, no stationery, no listing in any directory, no employees, no income or expenses—in short, no business or real existence. I find that S & G Shops was a mere instrumentality and alter ego of S & G of America, and that substantive consolidation is warranted.

"The power to consolidate is one arising out of equity, enabling a bankruptcy court to disregard separate corporate entities, to pierce their corporate veils in the usual metaphor, in order to reach assets for the satisfaction of debts of a related corporation." *In re Continental Vending Machine Corp.,* 517 F.2d 997, 1000 (2d Cir. 1975). Furthermore:

> Case law advises us that to grant consolidation the applicant has had to prove that the entities in question had no independent operations, having operated as a common enterprise, closely affiliated, that the entities concerned were mere instrumentalities or agents, departments or alter-egos of one another. In other cases consolidation has been authorized upon the finding of extensive commingling of assets and functions. And finally in *Chemical Bank of New York Trust v. Kheel,* 2 Cir., 369 F.2d 845 the Court set forth an additional criterion for consolidation that is present when the true nature of the inter-company relationships was so obscured that an effort to unscramble inter-company accounts would entail great expenditure of time and expense without assurance that an accurate reflection of those inter-relationships would be possible.

*In re Titio Castro Construction, Inc.,* 14 B.R. 569, 571 (Bankr.D.Puerto Rico 1981). Culled from a variety of courts, *see, e.g., In re Continental Vending Machine Corp.,* 517 F.2d 997 (2d Cir.1975), *In re Flora Mir Candy Corporation,* 432 F.2d 1060 (2d Cir. 1970), *Chemical Bank New York Trust Company v. Kheel,* 369 F.2d 845 (2d Cir. 1966) and *Soviero v. Franklin National*

*Bank of Long Island,* 328 F.2d 446 (2d Cir.1964), the bankruptcy court in *In re Vecco Construction Industries, Inc.,* 4 B.R. 407 (E.D.Va.1980) formulated a seven factor checklist:

The trial and appellate courts, in addressing the issue of consolidation, have delineated various criteria which, when used as a yardstick, have assisted the courts in determining whether it was proper to allow proceedings to be consolidated. These elements may be stated as follows: First, the degree of difficulty in segregating and ascertaining individual assets and liability. Second, the presence or absence of consolidated financial statements. Third, the profitability of consolidation at a single physical location. Fourth, the commingling of assets and business functions. Fifth, the unity of interests and ownership between the various corporate entities. Sixth, the existence of parent and inter-corporate guarantees on loans. Seventh, the transfer of assets without formal observance of corporate formalities.

*Id.* at 410. *See also, In re Gulfco Investment Corp.,* 593 F.2d 921 (10 Cir.1979), *Edwards Co. v. Monogram Industries, Inc.,* 700 F.2d 994 (5th Cir.1983), *Pepsi-Cola Metro. Bottling Co. v. Checkers, Inc.,* 754 F.2d 10 (1st Cir.1985); *In re Food Fair, Inc.,* 10 B.R. 123, (Bankr.S.D.N.Y. 1981); Tatelbaum, *The Multi-Tiered Corporate Bankruptcy and Substantive Consolidation—Do Creditors Lose Rights and Protection?* 89 Commercial Law Journal 285 (1984); *but see In re Snider Bros., Inc.,* 18 B.R. 230 (Bankr.D.Ma.1982), where Judge Glennon stated:

While several courts have recently attempted to delineate what might be called "the elements of consolidation", (citations omitted) I find that the the only real criterion is that which I have referred to, namely the economic prejudice of continued debtor separateness versus the economic prejudice of consolidation. There is no one set of elements which, if established, will mandate consolidation in every instance. Moreover, the fact that corporate formalities may have been ignored, or that different debtors are associated in business in some way, does not by itself lead inevitably to the conclusion that it would be equitable to merge otherwise separate estates.

*Id.* at 234.

No matter how thorough the Court, extensive the list of factors, or persuasive the parties, the gravaman of any consolidation complaint is the traditional but elusive concept known as piercing the corporate veil. This concept is the product of the most delicate of balancing—balancing of the policy of limited corporate liability (the very essence of the corporate concept, J. Landers, *A Unified Approach to Parent, Subsidiary & Affiliate Questions in Bankruptcy,* 42 University of Chicago L.Rev. 589, 617–18 (1975)) against the frustration of good faith creditors failing to receive payment in full. No court, no matter how eloquent, can address these two conflicting concerns to the satisfaction of all. This is not to consider, however, that the case law does not provide the Court with substantial guidance.

In determining whether there are grounds sufficient to consolidate, reference to state law concerning the concept known as "piercing the corporate veil" is appropriate. The leading Massachusetts case is *My Bread Baking Co. v. Cumberland Farms, Inc.,* 353 Mass. 614, 233 N.E.2d 748 (1968):

[The defendant/corporation] seeks to have us apply the principle that corporations are generally to be regarded as separate from each other and from their respective stockholders (*see Marsch v. Southern New England R.R.,* 230 Mass. 483, 498 [120 N.E. 120]) where there is no occasion "to look beyond the corporate for the purpose of defeating fraud or wrong, or for the remedying of injuries." *See e.g. McDonough Corp. v. Connolly,* 313 Mass. 62, 65–66 [46 N.E.2d 576]. The general principle is not of unlimited application. A corporation or other person controlling a corporation and directing, or participating actively in (*see Refrigeration Discount Corp. v. Catino,* 330 Mass. 230, 234–236 [112 N.E.2d

790] ), its operations may become subject to civil or criminal liability on principles of agency or of causation. *See Commonwealth v. Abbott Engr. Inc.* 351 Mass. 568, 579–580 [222 N.E.2d 862]. *See also Rock-Ola Mfg. Corp. v. Music & Television Corp.,* 339 Mass. 416, 422–423 [159 N.E.2d 417]. This may sometimes occur where corporations are formed, or availed of, to carry out the objectives and purposes of the corporations or persons controlling them. *See Rice v. Price,* 340 Mass. 502, 511–512 [164 N.E.2d 891]; *Centmont Corp. v. Marsch,* 68 F.2d 460, 464–465 (1st Cir.), *cert. den.* 291 U.S. 680 [54 S.Ct. 530, 78 L.Ed. 1068]. *See also Finnish Temperance Soc. Sovittaja v. Finnish Socialistic Publishing Co.,* 238 Mass. 345, 354–356 [130 N.E. 845]; *Henry F. Michell Co. v. Fitzgerald, ante,* [353 Mass.] 318, 321–322 [231 N.E.2d 373]. The circumstances in which one corporation, or a person controlling it, may become liable for the acts or torts of an affiliate or a subsidiary under common control have been frequently discussed. Although common ownership of the stock of two or more corporations together with common management, standing alone, will not give rise to liability on the part of one corporation for the acts of another corporation or its employees, additional facts may be such as to permit the conclusion that an agency or similar relationship exists between the entities. Particularly is this true *(a) when there is active and direct participation by the representatives of one corporation, apparently exercising some form of pervasive control, in the activities of another and there is some fraudulent or injurious consequence of the intercorporate relationship, or (b) when there is a confused intermingling of activity of two or more corporations engaged in a common enterprise with substantial disregard of the separate nature of the corporate entities, or serious ambiguity about the manner and capacity in which the various corporations and their respective representatives are acting.* In such circumstances, in imposing liability upon one or more of a group of "closely identified" corporations, a court "need not consider with nicety which one of them" ought to be held liable for the act of one corporation "for which the plaintiff deserves payment." *See W.W. Britton, Inc. v. S.M. Hill Co.,* 327 Mass. 335, 338–339, 98 N.E.2d 637. (footnotes omitted; emphasis added)

*Id.* 353 Mass. at 618–19, 233 N.E.2d at 751.

To be sure, in this case, there was no confused intermingling of assets, books, or creditors because, in fact, there was, in reality, only one business. S & G Shops was a totally inactive shell corporation. It did not even have the swaddling clothes of an infant business. It had no stationery, no telephone, no office, was not listed on directory at its corporate address, no employees, no active bank account, no expenses, and no income. Its by-laws actually forbid its engaging in any business other than allowing the debtor to operate under the franchise. S & G Shops had only one asset, the franchise contract. There was no "confused intermingling." There was a single operation, namely the debtor, and that was the face turned to the world, except for that little corner of the bush where the seller lay hidden. If that doesn't constitute fraud and the evidence of reliance is meager, it was a deliberate scheme to protect the seller's interest by insuring its status as sole creditor of the legal title holder of the franchise, namely, the shell, S & G Shops, in a manner likely to result in a fraud to creditors because of the concealment of any public awareness. The descriptions of S & G of America's financial assets would lead one to conclude that S & G of America, not S & G Shops, possessed the master franchise contract. But for fraud to lie, reliance must be proven. *See e.g., Brown v. Chaffee,* 612 F.2d 497 (10th Cir.1979); *Brockton Savings Bank v. Peat, Marwick, Mitchell & Co.,* 577 F.Supp. 1281 (D.Mass.1983); *Madison Fund, Inc. v. Charter Co.,* 406 F.Supp. 749 (S.D.N.Y. 1975). In the present case, very little reliance was proven. At trial, Jay Edward

McHugh, a vice president of the Mutual Bank, and John W. Hausner, Jr., a vice president for the Boston Five Cents Savings Bank testified on behalf of the trustee. Both had been officers responsible for loaning money to the S & G of America prior to the filing of its bankruptcy petition. Neither, however, testified that their bank had relied upon the fraudulent financial statements presented to them. *See* Exhibits 16, 18, 19, 20, 21 and 22. Specifically, Mr. McHugh testified that he did not rely on any representation of ownership regarding the franchise contract but, rather, relied solely upon the individuals involved. Although Mr. Hausner testified that he reviewed the financial documents, his testimony was of such a general nature that the Court cannot find that he, specifically, relied on such financial statements. Bankruptcy Rule of Procedure 8013 (due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of witnesses). Indeed, if either party was concerned with the financial statements of the debtor, which were somewhat ambiguous about the franchise ownership, an appropriate step would have been to secure their interest in the franchise agreement.

The trustee also presented the testimony of James Martinelli, the president of Transmission Parts, Inc., a pre-petition creditor in this case. Originally, Mr. Martinelli provided goods and credit to only the franchisees of Stop & Go. Those franchisees are current on paying their debts to Mr. Martinelli's company. In approximately May of 1984, the principals of S & G of America contacted Mr. Martinelli regarding the purchase of goods and the extension of credit for the company owned stores of S & G of America. As a result of their conversations, Transmission Parts, Inc. did supply and extend credit to the company owned stores and is presently owed approximately $21,000 in pre-petition debts. However, any decision to extend credit to S & G of America was not based upon any review of

the debtor's financial statement but, rather, on S & G of America's proposed plans *to go* nationwide, and the supposed *opportunity* for Transmission Parts, Inc. to be the main supplier of such an enterprise. Accordingly, there is, at best, slim evidence of the requisite reliance and any complaint based upon fraud must fail.

However, there is sufficient evidence of, and I so find, "active and direct participation by the representatives of one corporation, apparently exercising pervasive control, in the activities of another and there is some ... injurious consequence of the intercorporate relationship...." *My Bread Baking Co. v. Cumberland Farms, Inc.,* 353 Mass. 614, 619, 233 N.E.2d 748. In other words, S & G Shops was a mere *alter ego* of the debtor. As discussed more fully in the recital of facts above, S & G of America acted at all times as the owner of the franchise agreement. Although a license agreement between S & G of America and S & G Shops was prepared, it was never executed. Presumably, S & G of America acted pursuant to an oral license undisclosed to all creditors. No disclosure was made of the S & G of America/S & G Shops relationship. Indeed, no one was aware of the existence of S & G Shops except for the principals involved. Throughout the S & G of America FTC Disclosure Statement, S & G of America is referred to as the owner of the franchise rights and contracts. Further, as testified to by the trustee, there was no corporate headquarters for S & G Shops, and all the requisite corporate papers of S & G Shops were contained in the files of S & G of America. It is undisputed that the two companies shared the same corporate officers and directors, and that S & G Shops acted as the mere conduit of S & G of America. Finally, Stephen P. Winokur, president of both corporations, testified that as far as he was concerned, S & G Shops was a non-entity, part and parcel of S & G of America.[2] As noted by one court:

---

**2.** It should be noted further that Winokur, D'Anello, Stone, and S & G Shops, and S & G of America, for that matter, all filed answers that admitted all of the relevant allegations of the trustee's complaint on the issues of substantive consolidation. Only Boutin and DeCristoforo

Where outright fraud or bad faith is proved, of course the corporate veil will be pierced. That is axiomatic. It strikes us as equally axiomatic, however, that where a subsidiary is a mere agent or conduit and has, in fact, no real existence, the courts also may act to pierce the veil. The subsidiary must have some substance, some meat on its bones. The simple rubic of filing charters of incorporation for nonfunctioning subsidiaries will not suffice to insulate parent corporations from liability.

[W]e reiterate that the subsidiary must be more than a corporate charter embellished by a few formal niceties. We cannot, as in the case of the Emperor's new clothes, pretend to see something which does not exist ...

As the appellants aptly put it, Monotronics was just a piece of paper lying in a file cabinet at 100 Wilshire Boulevard in Santa Monica, California.

*Edwards Co. v. Monogram Industries, Inc.*, 700 F.2d 994, 1002–1003 (5th Cir. 1983). Perhaps the only difference between *Edwards* and the case at bar is the location of the piece of paper. *See also Soverio v. Franklin National Bank of Long Island*, 328 F.2d 446 (2d Cir.1964):

[The subsidiaries] were but instrumentalities of the bankrupt with no separate existence of their own. Consequently, there existed a unity of interest and ownership common to all corporations, and that to adhere to the separate corporate entities theory would result in an injustice to the bankrupt's creditors.

*Id.* at 448. Further, regarding the "injurious consequences" of the parties, if the Court were not to allow consolidation, the creditors of S & G of America would be denied the opportunity to share in the only real asset available to them. With the exception of the franchise contract, the only other assets for this company of $1.3 million debt is the possible recovery from fraudulent transfers and preferences—any other assets are minimal. Further, although this Court has found no specific

contested the trustee's claim for substantive con-

creditor reliance, at the very core of any business relationship is a natural assumption that a business is what it purports to be. Creditors derive their impressions of the enterprise from the manner in which it holds itself out to them. In the case at bar, creditors had no cause to question the assets and financial viability of S & G of America. Accordingly, I find active and direct participation, pervasive control, and injurious consequences meriting piercing the corporate veil and substantive consolidation.

■ Finally, the defendants have argued that they, too, will be prejudiced by substantial consolidation. In short, by consolidation, their debt will be combined with the other creditors of S & G of America while, without consolidation, they would be the only creditor of S & G Shops and be entitled to distribution of its one remaining asset—the franchise contract. Such a contention should not be easily dismissed. As stated by the Court in *Chemical Bank New York Trust Co. v. Kheel*, 369 F.2d 845 (2d Cir.1966):

The power to consolidate should be used sparingly because of the possibility of unfair treatment of creditors of a corporate debtor who have dealt solely with that debtor without knowledge of its interrelationship with others.

*Id.* at 847. *See also* the concurring opinion of Judge Friendly—the "creditor who was ignorant of the loose manner in which corporate affairs were being conducted" should not be so prejudiced. *Id.* at 848. However, the Court cannot find that the defendants were ignorant of the relationship of the companies. It was at their insistence that the two operating companies were formed. Further, the defendants did not see to it that the license agreement, drawn at their insistence, was, indeed, executed by the appropriate parties. Neither did they concern themselves with any statements in the FTC Disclosure Statement. Finally, the one mechanism that could have completely protected them went unutilization.

solidation.

lized—the security agreement regarding the franchise agreement was never filed. This inaction also insured that no creditor could become aware of the existence of Stop & Go Shops. The defendants are not as innocent as they would like the Court to believe. While a seller can and should be expected to protect the purchase price, it cannot be allowed to do it in so devious a manner. Whether its scenario results in fraud or not, should not be only a matter of chance. Legal shrewdness is often but a neighbor to an unconscionable scheme.

Accordingly, the substantive consolidation of Stop & Go of America and Stop & Go Shops is ordered. Bou-Faro Company and their assigns, Boutin and DeCristoforo, failed to perfect any alleged security interest and are, therefore, general unsecured creditors. Judgment for the plaintiff/trustee on Counts II, III and IV.

Howard Berlin, Miami, Fla., for HMS.

Louis Jepeway, Walter Kovner, Miami, Fla.,, for Hochberg.

Arthur Weitzner, Miami, Fla., for Alters.

Patricia Redmond, Miami, Fla., for Israel.

Jerry Markowitz, Miami, Fla., for Debtor.

Patricia Silver, Miami Beach, Fla., for Molko, Trustee.

Norman Frank, Harvey Ziegler, Polk City, Fla., for Segal, State Court Receiver.